IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., <u>et al.</u>, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 00-389 (MFW) |
| | ) | |
| _____ | ) | |
| Abe Briarwood Corporation | ) | |
| | ) | |
| Appellant, | ) | CA No. 06-479 (GMS) |
| | ) | |
| v. | ) | |
| | ) | |
| IHS Liquidating LLC | ) | |
| | ) | |
| Appellee | ) | |
| _____ | ) | |

## <u>OPENING BRIEF OF APPELLANT</u>

Dated: February 7, 2007
     Wilmington, Delaware

**DUANE MORRIS LLP**
Frederick B. Rosner (ID No. 3995)
1100 North Market Street
Wilmington, Delaware 19801
Tel: (302) 657-4900
Fax: (302) 657-4901

**BACKENROTH FRANKEL &
KRINSKY LLP**
Abraham Backenroth (AB-1989)
489 Fifth Avenue, 28th Floor
New York, New York 10017
Tel: (212) 593-1100
Fax: (212) 644-0544

***Counsel to Abe Briarwood Corporation***

**TABLE OF CONTENTS**

Page

STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION .............................. 1

STATEMENT OF THE ISSUES PRESENTED AND THE  APPLICABLE
STANDARD FOR APPELLATE REVIEW ..................................................................... 1

Issues On Appeal ............................................................................................................. 1

Standard of Review .......................................................................................................... 2

STATEMENT OF THE CASE ........................................................................................... 2

Nature Of The Case And Course Of Proceedings ........................................................... 2

Statement Of The Facts Relevant To The Issues Presented For Review ........................... 4

The LLC Retained The "Excluded Liabilities", Which Included Both (i) "Liabilities of
the Seller Under The (SPA)"; And (ii) "Liabilities relating to Excluded Assets"; While
Briarwood Acquired IHS' Assets, Including"deposits" And "prepaid items" ................... 4

Other Relevant SPA Terms................................................................................................ 5

The Court Approved July 21, 2003 Stipulation Reaffirms IHS' Obligation Under SPA
§5.16 To Pay Any Medicaid Recoupments Prior To Closing ........................................... 5

The LLC's Failure To Release Approximately  $1.5 Million In Post-Closing Medicare
Receivables ...................................................................................................................... 7

The Debtors' Failure To Pay Approximately $9.5 Million  In Pre-Closing Georgia
Medicaid Overpayments .................................................................................................. 7

The Debtors' Failure To Pay Approximately $2 Million In Pre-Closing Trust Fund
Taxes............................................................................................................................... 9

ARGUMENT..................................................................................................................... 9

I.  The Bankruptcy Court Erred In Denying Briarwood's Motion To  Release The
Approximate $1.5 Million Post-Closing Medicare Receivable, Since It Was An Account
Receivable Purchased Under The SPA And  Not An "Excluded Asset" ........................... 9

A.  Since the LLC's Objection Failed To Raise Any Substantive Defenses  To The
Motion To Release The Post-Closing Medicare Receivable, Briarwood Was Unfairly
Prejudiced By The Court's Ruling.................................................................................. 10

B.  The SPA Did Not Contemplate A Waiver Of All Briarwood's Rights  To Recover All Receivables Owed By CMS To The Debtors .................................................................. 10

C.  By Allowing The LLC To Retain The $1.5 Million Post-Closing  Medicare Receivable, The Bankruptcy Court Vitiated The Net  Effect Of The Government Settlement, Which Required The LLC To Make A $ 2 Million Payment To The Government..................................................................................................................... 11

II.  The Bankruptcy Court Erred In Denying Briarwood Reimbursement For Approximately $9.5 Million In Georgia Medicaid Overpayments Made Prior To Closing, Which The Debtors Failed To Repay ............................................................................. 12

A.  The Bankruptcy Court Erred In Ruling That The SPA Did Not Require IHS To Pay Any Of The Georgia Medicaid Overpayments Pre-Closing............................................. 12

B.  Since The Georgia Medicaid Overpayments Have Been Characterized  By Both IHS And The GDC  As "prospective" Payments, They  Alternatively Constitute Either "prepaid items"Or "deposits", And/Or Should Have Been Held In Trust........................ 14

C.  By Agreeing To Pay Certain Limited Medicaid Liabilities To One Landlord To Avoid A Protracted Litigation, Briarwood Did Not Knowingly And Intentionally Waive Its Rights To Recover $9.5 Million In Georgia Medicaid Overpayments, Especially Absent A Writing As Required Under SPA §12.17..................................................................... 16

III.  The Bankruptcy Court Erred In Denying Briarwood Reimbursement For Approximately $2 Million In Trust Fund Taxes For Employee Wages That Accrued Pre-Closing, Which The Debtors Failed To Pay .................................................................. 17

A.  The Bankruptcy Court Ignored That SPA §5.1 Required The  Debtors To Comply With All Legal Requirements, And/Or Precluded  Them From Incurring Debt In Excess of $250,000, Which They Failed To Do, And Which Constitute Excluded Liabilities.... 18

B.  The Debtors' Improper Failure To Segregate The Trust  Fund Taxes, Does Not Change Their Status As Either "Trust Funds", "Related To Cash" Or "Pre-paid Items" Or "Deposits" ................................................................................................................... 19

CONCLUSION........................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76
(3d Cir. 1999)............................................................................................................5, 6

*Amrep Corporation v. American Home Assurance Company*, 81 A.D.2d 325, 329
(1st Dep't 1981)..........................................................................................................20

*Gephart v. United States of America*, 818 F.2d 469 (6th Cir. 1987) ...........................................21

*Glenn v. Garth*, 133 N.Y. 18 (1892) ...........................................................................20

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) ....................6, 7

*Raven Media Inv., LLC v. DirectTV Latin Am. LLC (In re DirectTV Latin Am.,
LLC)*, 2004 WL 302303 at*2 ................................................................................................2

*In re Sykes & Sons, Inc.*, 188 B.R. 507 (Bankr. E.D. Pa. 1995) ....................................................21

*In re Visiting Nurse Assn of Western Pennsylvania*, 101 B.R. 462 (Bankr. W.D.
Pa. 1989) ...........................................................................................................................19

## STATUTES

26 U.S.C. §6672..............................................................................................................21

26 U.S.C. §7501(a) ...............................................................................................21, 23

28 U.S.C. § 158(a) ..................................................................................................................5

IRS. 26 C.F.R. §31.6302-1 ...........................................................................................21, 22, 23

26 U.S.C. §§ 3102 & 3402............................................................................................................21

Abe Briarwood Corporation files its Brief of Appellant. Appellant Abe Briarwood Corporation will be referred to as Briarwood. Appellee IHS Liquidating LLC will be referred to as LLC.

### STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

This Court has jurisdiction of this appeal under 28 U.S.C. § 158(a). 28 U.S.C. 158(a); American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999).

### STATEMENT OF THE ISSUES PRESENTED AND THE APPLICABLE STANDARD FOR APPELLATE REVIEW

**Issues On Appeal**

The issues on appeal in this case include the following:

1.    Whether the bankruptcy court erred in denying Briarwood's motion to permit it to release certain funds in the amount of $1,554,815.41, which had been paid by the United States Centers for Medicare and Medicaid Services ("CMS") to the LLC after the closing ("Closing") of the stock purchase agreement ("SPA"), and is now held in trust by Briarwood.

2.    Whether the bankruptcy court erred in denying the branch of Briarwood's motion to compel, which sought to compel the LLC to reimburse Briarwood for approximately $9.5 million in overpayments made by Georgia Medicaid authorities to the Debtors prior to the Closing of the SPA, which the Debtors failed to pay.

3.    Whether the bankruptcy court erred in denying the branch of Briarwood's motion to compel, which sought to compel the LLC to reimburse Briarwood for approximately $2 million in trust fund taxes for employee wages that accrued prior to the Closing of the SPA, which the Debtors failed to pay.

**Standard of Review**

In reviewing an order of the bankruptcy court, this Court applies a clearly erroneous standard of review to the bankruptcy court's findings of fact. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999); Raven Media Inv., LLC v. DirectTV Latin Am. LLC (In re DirectTV Latin Am., LLC), WL 302303, at *2, 42 Bank. Ct. Dec. 169 (D. Del. Feb. 4, 2004). The Court applies a plenary standard to the bankruptcy court's legal conclusions. Id. If there are mixed questions of law and fact, the Court accepts the bankruptcy court's "findings of historical or narrative facts unless clearly erroneous, but exercises 'plenary review of the (bankruptcy) court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Raven Media Inv., LLC, WL 302303, at *2 (citing Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991)). In reviewing bankruptcy court decisions, district courts further take into consideration the fact that the Unites States Court of Appeals for the Third Circuit effectively reviews bankruptcy court opinions on a de nova basis. Id. at *2.

## STATEMENT OF THE CASE

**Nature Of The Case And Course Of Proceedings**

On February 2, 2000, Integrated Health Services, Inc. ("IHS" or "Seller") and its related entities (collectively, the "Debtors") filed voluntary chapter 11 petitions (D-21, p. 1). In late 2002, the Debtors negotiated a stock purchase agreement to sell substantially all their businesses and business assets (Id.). That agreement was, however, subject to higher bids and an auction was held on January 22, 2003, at which time Briarwood was the successful bidder (Id.). On January 28, 2003, IHS and Briarwood executed the SPA

2

(Id.)(D-24, Ex. 1). On March 13, 2003, the bankruptcy court issued an Order approving

Briarwood as the successful bidder and authorizing the Debtors to perform the SPA upon

consummation of the Debtors' Amended Joint Plan of Reorganization ("Plan"), which

was filed that same date (D-21, p. 2). On May 12, 2003, the bankruptcy court entered and

Order confirming the Plan (Id.). Pursuant to the Plan and SPA (§5.9), the Debtors

transferred all their assets and liabilities, except for certain "Excluded Assets" and

"Excluded Liabilities", into two operating subsidiaries and sold the stock of those

subsidiaries to Briarwood (Id.)(D-24, Ex.'s 1-3).

Subsequent to Closing, numerous issues arose for which Briarwood sought

reimbursement from the LLC (D-21, p. 2), including approximately $2 million in pre-

Closing trust fund taxes and $9.5 million in pre-Closing medicaid overpayments (D-11).

Unable to resolve the issues, on December 8, 2004, Briarwood moved to compel the

Debtors to comply with the SPA (D-21, p. 2). On May 31, 2005, the LLC, the successor

to the Debtors under the Plan, opposed the motion and cross-moved for affirmative relief

(Id.). On June 20, 2005, Briarwood submitted reply papers.

On July 11, 2005, both Briarwood and the LLC filed their contentions of fact. On

July 13 and August 10, 2005, the Court held hearings at which evidence was presented

(Id.).

On October 21, 2005, Post-Trial Briefs were filed (D-11 & 12). On November 11,

2005, the LLC moved to file a supplemental memorandum. On November 16, 2005,

Briarwood opposed the Liquidating LLC's motion to supplement.

On January 20, 2006, Briarwood filed a motion to release approximately $1.5

million in funds paid by the CMS to the LLC in late 2005 and placed in trust pending

3

resolution (D-15). On February 3, 2006, the LLC opposed the motion (D-16). On

February 6, 2006, Briarwood filed a motion for leave to reply (D-17). By Order dated

February 6, 2005, the bankruptcy court granted Briarwood's motion for leave to reply (D-

18).

On June 20, 2006, the bankruptcy court issued an Opinion (D-21) and Order (D-

22), which granted the LLC's motion to file a supplemental memorandum, denied

Briarwood's motions to compel and for release of the CMS funds and denied all of the

Liquidating LLC's counterclaims, except for replacing certain letters of credit which was

adjourned (D-21). Briarwood timely filed its Notice of Appeal from the Order (D-23).

**STATEMENT OF THE FACTS RELEVANT**
**TO THE ISSUES PRESENTED FOR REVIEW**

**The LLC Retained The "Excluded Liabilities", Which Included Both (i) "Liabilities of the Seller Under The (SPA)"; And (ii) "Liabilities relating to Excluded Assets"; While Briarwood Acquired IHS' Assets, Including"deposits" And "prepaid items"**

Pursuant to the Plan and SPA (§5.9), the Debtors transferred all their assets and

liabilities, except for certain "Excluded Assets" and "Excluded Liabilities", into two

operating subsidiaries and sold the stock of those subsidiaries to Briarwood (D-24, Ex.'s

1-3). The LLC, the successor to the Debtors under the Plan (D-21, p. 2), retained the

"Excluded Assets" and "Excluded Liabilities" (D-24, Ex.'s 1-3). The "Excluded

Liabilities" include, among others, the Seller's liabilities under the SPA and all liabilities

relating to the "Excluded Assets" (SPA Sched. IV)(D-24, Ex. 3). Although "Cash" was

listed as an "Excluded Asset", it expressly excluded "deposits" and "prepaid items" (SPA

Sched III)(D-24, Ex. 2). Thus, Briarwood effectively acquired all IHS' assets (except

"Excluded Assets") and all "deposits" and "prepaid items".

4

**Other Relevant SPA Terms**

Under SPA §5.16, IHS "agree[d] to pay any Medicaid recoupments prior to the Closing in the Ordinary Course of Business" (SPA §5.16)(D-24, Ex. 1).

SPA §5.1 further required IHS and the Debtors, between the execution of the SPA to the Closing, to operate each facility in compliance with all applicable Legal Requirements (SPA §5.1)(D-24, Ex. 1). The SPA defines Legal Requirements to mean "all laws, statutes, ordinances, bylaws, codes, rules, regulations, restrictions .... promulgated or issued by any Governmental Authority...."(SPA §1.1)(D-24, Ex. 1).

SPA §5.1(k) further precluded the Debtors from incurring any obligations in excess of $250,000 during the period from the date of the SPA to Closing (SPA §5.1(k)); while SPA §5.1(g) precluded the Debtors from incurring any debt in excess of $250,000 during the period from the date of the SPA to Closing (SPA §5.1(g))(D-24, Ex. 1).

Moreover, SPA §12.17 expressly prohibits waiver of any SPA provision, unless such waiver is in writing (SPA §12.17)(D-24, Ex. 1). SPA §11.9 contains a merger clause which indicated that it (i) together with the Exhibits, Schedules and other documents referred to "contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein"; and (ii) "may be amended only by a written instrument executed by or on behalf of the Seller and (Briarwood)" (SPA §11.9)(D-24, Ex. 1).

**The Court Approved July 21, 2003 Stipulation Reaffirms IHS' Obligation Under SPA §5.16 To Pay Any Medicaid Recoupments Prior To Closing**

Under the original SPA, the Closing was to occur by July 31, 2003 (D-11, para 19). IHS, however, breached the SPA in several respects which prevented the Closing, including failing to provide the certification of the EBITDA calculation required under

5

SPA §5.17 (Id.). Thus, by fax letter, dated June 24, 2003, Briarwood notified IHS that it wished to close on or before July 15, 2003 (Id.). In response to Briarwood's letter, IHS issued a fax notice later that night at approximately 9:00 p.m., purporting to terminate the SPA on the specious ground that it is highly unlikely that Briarwood could close by July 31, 2003 (Id.). Briarwood then filed two (2) separate motions to compel IHS to consummate the SPA (Id.).

Following "extensive litigation and negotiations", IHS and Briarwood entered into a stipulation, dated July 21, 2003 (the "July 21, 2003 Stipulation") (D-25, Ex. 2), which reinstated the SPA, but modified certain SPA terms, including §5.16 (D-11, para 20).

Under SPA §5.16, IHS "agree[d] to pay any Medicaid recoupments prior to the Closing in the Ordinary Course of Business". Under the July 21, 2003 Stipulation, the parties reaffirmed the first sentence of SPA §5.16 which confirmed IHS' "agree[ment] to pay any pre-Closing Medicaid recoupments ...." (D-25, Ex. 2, para 29).

The July 21, 2003 Stipulation also modified the purchase price to $95,000,018 (D-25, Ex. 2, para 21). By Order, dated July 21, 2003, the bankruptcy court approved the July 21, 2003 Stipulation (D-2, para 20)(D-5, p. 59[7-8]).

IHS and Briarwood agreed to schedule the Closing for August 29, 2003 (D-11, para 24). Although Briarwood had already paid IHS approximately $90 million by the close of business on August 29, 2003, there was an inadvertent delay concerning a Briarwood wire transfer of approximately $5 million (Id.). Instead of attempting to resolve the matter in good faith, IHS attempted to extort additional funds from Briarwood to effectuate the Closing (Id.).

6

On or about September 2, 2003, following yet another round of "extensive negotiations", IHS and Briarwood agreed to proceed to Closing effective as of August 29, 2003, and entered into a letter agreement, dated as of August 29, 2003 ("August 29, 2003 Letter Agreement")(D-25, Ex. 3). The August 29, 2003 Letter Agreement required Briarwood to pay IHS an additional $3 million to effectuate the Closing (D-25, Ex. 3, para 1).

**The LLC's Failure To Release Approximately**
**$1.5 Million In Post-Closing Medicare Receivables**

Pursuant to the SPA (§5.9), Briarwood acquired all IHS' assets (except "Excluded Assets"), including all account receivables (D-24, Ex. 1). In late 2005, more than two years post-Closing, CMS paid $1,554,815.41 to the LLC for monies owed to the Debtors (D-15, para 7). Since, the CMS funds were not listed as an SPA "Excluded Asset" (D-24, Ex. 2), they were a post-closing receivable now owned by Briarwood ("Post-Closing Medicare Receivable").

By letter, dated December 5, 2005 (D-15, Ex. D), Briarwood made demand upon the LLC for the turnover of the $1,554,815.41 Post-Closing Medicare Receivable. In response, the LLC agreed to allow the Post-Closing Medicare Receivable to be held in trust by Briarwood's counsel, pending an appropriate Court Order permitting its release (D-15, Ex. A).

**The Debtors' Failure To Pay Approximately $9.5 Million**
**In Pre-Closing Georgia Medicaid Overpayments**

On November 4, 2003, Kim Hinton, Director of Financial Services of the Georgia Department of Community Health ("GDC"), testified during an evidentiary hearing before the bankruptcy court ("November 4, 2003 Hearing") that the GDC overpaid the

7

Debtors in excess of $9.5 million in "prospective" Medicaid payments during the pre-
Closing period from April 2003 to August 2003 ("Georgia Medicaid Overpayments")(D-
25, pp. 19[3-14] & 20[14-24]).

Moreover, the Seller was aware that it received in excess of $9.5 million in pre-
Closing Georgia Medicaid Overpayments, since its books and records recorded the
Georgia Medicaid Overpayments and likewise classified them as "prospective" payments
in a general account, designated as account # 110370, Medicaid AR Clearing (D-24, Ex.
8)(D-21, p. 15).

Additionally, sometime prior to Closing, the GDC advised IHS, including through
IHS employees, Tyrone Tavalez, Joan Sloan and Marci Heintz (D-24, Ex. 18) (D-5, pp.
113[25]-114[1-6]), that the Debtors and their facilities had received $9,506,944.90 in
Georgia Medicaid Overpayments. (William Bradley Bennett, IHS' Chief Financial
Officer, testified that all three (3) individuals were IHS employees (D-5, p. 103 [23-25])).
In response, a pre-Closing reconciliation was prepared, confirming that the Debtors and
facilities had received $9,506,944.90 in pre-Closing Georgia Medicaid Overpayments (D-
25, pp. 29[21-25], 30[18-25]-34[1-4]); and listing the Debtors' various facilities which
received the Georgia Medicaid Overpayments and the specific sum received by each
facility (D-24, Ex. 18).

On August 28, 2003, prior to Closing, Mark Trail, the GDC Chief, made demand
upon IHS to pay back the $9,506,944.90 in Georgia Medicaid Overpayments (D-25, Ex.
27, pp. 27[18-24], 30[18-25]-34[1-4]). Nevertheless, neither IHS, nor the LLC paid back
the $9,506,944.90 in Georgia Medicaid Overpayments, as confirmed by the trial

8

testimony of Murray Forman (D-5, p. 25[8-10]), Briarwood's advisor and reconciler of

all SPA claims as of the Closing (D-5, pp. 12 [3-7], 14[8-10] & 21[5-7]).

**The Debtors' Failure To Pay Approximately**
**$2 Million In Pre-Closing Trust Fund Taxes**

Subsequent to Closing, Briarwood discovered that the Debtors failed to pay

approximately $2 million in withholding taxes, which were withheld from their

employees but not remitted to the Governmental Authorities on or prior to the Closing

("Trust Fund Taxes")(D-24, Ex. 6). The Debtors' non-payment of the pre-Closing Trust

Fund Taxes was confirmed by both the testimony of Murray Forman (D-5, pp. 14[16-21],

16[16-20] & 17[3-5]), and William A. Johnsen ("Johnsen"), IHS' Vice-President and

Officer (D-7, p. 17 [22-25]) under cross-examination (D-6, pp. 94[1-6] & 95[12-23]).

## ARGUMENT

I.    **The Bankruptcy Court Erred In Denying Briarwood's Motion To**
     **Release The Approximate $1.5 Million Post-Closing Medicare Receivable,**
     **Since It Was An Account Receivable Purchased Under The SPA And**
     **Not An "Excluded Asset"**

Pursuant to the SPA (§5.9), Briarwood acquired all IHS' assets (except "Excluded

Assets"), including all account receivables (D-24, Ex. 1). Nevertheless, in late 2005,

more than two years post-Closing, CMS paid the approximate $1.5 million Post-Closing

Medicare Receivable owed to the Debtors to the LLC (D-15, para 7). The Post-Closing

Medicare Receivable was not listed as an SPA "Excluded Asset" (D-24, Ex. 2), and was

therefore a post-closing receivable now owned by Briarwood. Consequently, Briarwood

moved for release of the Post-Closing Medicare Receivable (D-15).

9

A.    **Since the LLC's Objection Failed To Raise Any Substantive Defenses
To The Motion To Release The Post-Closing Medicare Receivable,
Briarwood Was Unfairly Prejudiced By The Court's Ruling**

The LLC filed an objection to Briarwood's motion which did not dispute that the

Post-Closing Medicare Receivable was an account receivable acquired by Briarwood

under the SPA, and that it was not an "Excluded Asset" (D-16). In fact, the LLC's

objection failed to to raise any substantive defense to Briarwood's motion, as opposed to

mere hyper-technical procedural defenses, i.e., the relief should be by adversary

proceeding; the relief should be deferred pending discovery, and/or Briarwood's prior

motion to compel (D-16, paras 12-14).

The bankruptcy court also correctly recognized that the $1.5 million in CMS

funds were an account receivable (D-21, p. 22). Nevertheless, the bankruptcy court

incorrectly ruled that the Post-Closing Medicare Receivable belongs to the LLC, raising

on its own that the SPA contemplated that all Government claims would be resolved (D-

21, p. 26) pursuant to an August 28, 2003 settlement between the Debtors and the United

States (the "Government Settlement")(D-25, Ex. 20).

Preliminarily, the LLC's objection never raised this argument (D-16). Thus,

Briarwood was unfairly prejudiced and therefore deprived of due process by the

bankruptcy court's ruling.

B.    **The SPA Did Not Contemplate A Waiver Of All Briarwood's Rights
To Recover All Receivables Owed By CMS To The Debtors**

Moreover, the bankruptcy court ignored that the SPA merely contemplated that

the Government Settlement would resolve all Government claims against the Debtors

(see, SPA §6.17, requiring a settlement agreement regarding the Government's "asserted

claims against Seller" [IHS])(D-24, Ex. 1), as opposed to a waiver of Briarwood's rights

10

to recover all receivables owed by CMS to the Debtors. Rather, pursuant to the SPA

(§5.9), Briarwood acquired all IHS' assets, including all account receivables (D-24, Ex.

1).

**C.    By Allowing The LLC To Retain The $1.5 Million Post-Closing
       Medicare Receivable, The Bankruptcy Court Vitiated The Net
       Effect Of The Government Settlement, Which Required The
       LLC To Make A $ 2 Million Payment To The Government**

The bankruptcy court also improperly lumped the $1.5 million receivable with a

separate $17.1 million owed by CMS to the LLC which pursuant to the Government

Settlement was earmarked to pay 19.1 million owed by the LLC to the Government for

settlement of certain claims (D-25, Ex. 20). Both the bankruptcy court and the LLC

acknowledged that the "net effect" of the Government Settlement was that the LLC

"owed the United States $2 million", or the differential between the 19.1 million and 17.1

million payments, which the LLC paid.

In that regard, the bankruptcy court expressly found that: "(t)he net effect of the

agreement was that the Debtors owed the United States $ 2 million" (D-21, p. 23).

Similarly, the LLC admitted liability for the net $2 million payment, including through

the testimony of both Johnsen (IHS' Vice President) on direct examination (D-7, p. 50[2-

6]) and Stephen A. Greene, lead Financial Advisor to the Official Committee of

Unsecured Creditors on cross-examination after impeachment (D-7, pp. 117[19-25] &

118[1-12]). By lumping the $1.5 million receivable together with the $17.1 million

receivable, the bankruptcy court incorrectly vitiated the net effect of the Government

Settlement, and reduced the LLC's net liability from $2 million to only $500,000.

11

II.    **The Bankruptcy Court Erred In Denying Briarwood Reimbursement For Approximately $9.5 Million In Georgia Medicaid Overpayments Made Prior To Closing, Which The Debtors Failed To Repay**

During the November 4, 2003 Hearing, Kim Hinton, GDC Director of Financial

Services testified that the GDC overpaid the Debtors in excess of $9.5 million in Georgia

Medicaid Overpayments during the pre-Closing period from April 2003 to August 2003.

The bankruptcy court found that the Debtors were aware of the Georgia Medicaid

Overpayments (D-21, p. 15), as confirmed by their books and records which also

recorded and classified them as "prospective" payments in a general account (Id.). The

bankruptcy court further found that on August 28, 2003, prior to Closing, Mark Trail, the

GDC Chief, made demand upon IHS to pay back the $9,506,944.90 in Georgia Medicaid

Overpayments (D-21, p. 15).

A.    **The Bankruptcy Court Erred In Ruling That The SPA Did Not Require IHS To Pay Any Of The Georgia Medicaid Overpayments Pre-Closing**

SPA §5.16 requires IHS to pay any pre-Closing Medicaid recoupments in the

ordinary course of business. Section 5.16 states in relevant part that: "The Seller (IHS)

agrees to pay any Medicaid recoupments prior to the Closing in the Ordinary Course of

Business." Under cross-examination, Johnsen, IHS' Vice-President (D-7, p. 17[22-25]),

admitted after impeachment during the August 10, 2005 Hearing that the Georgia

Medicaid Overpayments would constitute Medicaid recoupments (D-7, pp. 82[24-25],

83[1-2] & 84[8-20]).

SPA §5.1(k) further precluded the Debtors from incurring any obligations in

excess of $250,000 between execution of the SPA to Closing (D-26, Ex. 1). Thus, the

Georgia Medicaid Overpayments constitute liabilities under the SPA (§'s 5.16 & 5.1[k]),

which are "Excluded Liabilities" that remain with IHS (D-24, Ex. 3).

12

The bankruptcy court initially observed that IHS was not liable under §5.16 because no agreement or recoupment actually occurred pre-Closing (D-21, p. 18). Preliminarily, the LLC never raised this argument. Nor did the LLC challenge Briarwood's assertion that Johnsen admitted that the Georgia Medicaid Overpayments would constitute Medicaid recoupments. Nevertheless, the bankruptcy court disputed Briarwood's assertion, relying upon Johnsen's testimony that "(i)t would be recoupment when the State of Georgia recouped it." (D-21, p. 18). However, the bankruptcy court ignored Johnsen's additional testimony during the August 10, 2005 Hearing that the Georgia Medicaid Overpayments would constitute Medicaid recoupments, as follows:

> "Q.    So would the claim of Georgia for 9,506,944.90 be, in your opinion, a recoupment payment?
>
> "A     Say that again.
>
> "Q     Would the 9,506,944.90 claim by the State of Georgia, would that be, in your opinion, a Medicaid recoupment item?
>
> "A     I think you could call it a Medicaid recoupment."
>
> "Q     Do you recall testifying to that?
>
> "A     Yes .... (D-7, p. 84[15-22]).

The bankruptcy court further noted that SPA §5.16 did not require payment of the Georgia Medicaid Overpayments pre-Closing, since the Debtors ordinarily made such payments over time by recouping. The bankruptcy court's observation ignores its own finding that on August 28, 2003, prior to Closing, Mark Trail, the GDC Chief, made demand upon IHS to pay back the $9,506,944.90 in Georgia Medicaid Overpayments (D-21, p. 15).

13

Furthermore, the bankruptcy court acknowledged that the Georgia overpayment amount was (a) determined pre-Closing; and (b) required to be paid, at worst, in the ordinary course of business. Thus, the bankruptcy court's interpretation leads to an absurd result, since it completely vitiates IHS's obligation to pay, even in the ordinary course of business. The bankruptcy court's interpretation is further absurd, because if recoupment actually occurred it would have reduced or been a deduction of the amount of the Georgia Medicaid Overpayments. In any event, the bankruptcy court also ignores SPA §5.1(k), which precluded the Debtors from incurring debt in excess of $250,000, much less approximately $9.5 million (D-24. Ex. 1).

**B.    Since The Georgia Medicaid Overpayments Have Been Characterized By Both IHS And The GDC As "prospective" Payments, They Alternatively Constitute Either "prepaid items"Or "deposits", And/Or Should Have Been Held In Trust**

The bankruptcy court found that both the GDC and Debtors' books and records characterized the Georgia Medicaid Overpayments as "prospective" payments (D-21, p. 19). Furthermore, under cross-examination, Robert Scott Rosenfeld ("Rosenfeld"), the LLC's expert accounting witness, acknowledged after impeachment that "prospective" payments or payments made in advance of services rendered, would constitute a "prepaid item" (D-7, pp. 145[3-25], 146[1-4 & 17-25] & 147[1-7]). Since the Georgia Medicaid Overpayments were made in advance of services rendered, they also constitute "prepaid items" which are a "Cash" exclusion (D-24, Ex. 2), and which should have been turned over to Briarwood at Closing.

The bankruptcy court noted that both the Debtors' and GDC's characterization of the Georgia Medicaid Overpayments as "prospective" payments, does not make them

14

pre-paid items or deposits, since they are not assets but rather liabilities. The bankruptcy court reached this conclusion based on Rosenfeld's testimony, and evidence that the Debtors did not segregate such payments but rather swept them into the Debtors' concentration account. Preliminarily, the bankruptcy court ignored that the Debtors' description of the Georgia Medicaid Overpayments as "prospective payments" is an admission and binding against the LLC. The bankruptcy court also ignored Rosenfeld's expert testimony that "prospective" payments or payments made in advance of services rendered, would constitute a "prepaid item". Moreover, the bankruptcy court overlooked that the Debtors' improper failure to segregate the Georgia Medicaid Overpayments, does not change their status as either pre-paid items or deposits.

Alternatively, the Georgia Medicaid Overpayments constitute excess payments which belong to the GDC and unjustly enriched the Debtors, and therefore should have been held in trust for the GDC. In re Visiting Nurse Ass'n of Western Pennsylvania, 101 B.R. 462 (Bankr. W.D. Pa. 1989), aff'd, 143 B.R. 633 (W.D. Pa 1992), aff'd, 986 F.2d 1410 (3d Cir. 1993) (bankrupt provider held Medicare over payments in a constructive trust for Medicare). Since the Debtors should have held the Georgia Medicaid Overpayments in trust for or set aside to pay the GDC, they constitute "deposits", as a matter of law, which are also exclusions to "Cash" (D-24, Ex. 2). The Georgia Medicaid Overpayments also constitute a liability relating to an "Excluded Asset", i.e., "Cash" which should have been used to pay the overpayments (D-24, Ex. 3).

The LLC did not address the Court's ruling in Visiting Nurse. Nevertheless, the bankruptcy court attempted to distinguish Visiting Nurse, on the sole ground that there the debtor had segregated the funds (D-21, pp. 20-21). As stated, the Debtors' improper

failure to segregate the Georgia Medicaid Overpayments, does not change their status as

either pre-paid items or deposits.

**C.    By Agreeing To Pay Certain Limited Medicaid Liabilities To One Landlord To Avoid A Protracted Litigation, Briarwood Did Not Knowingly And Intentionally Waive Its Rights To Recover $9.5 Million In Georgia Medicaid Overpayments, Especially Absent A Writing As Required Under SPA §12.17**

The Court also ruled that Briarwood waived its rights to recover the Georgia

Medicaid Overpayments, since it agreed to pay certain limited Medicaid liabilities

relating to the Foster Nursing Home to avoid a protracted litigation (D-21, p. 21).

Preliminarily, the LLC did not raise this specific waiver argument in its post-trial brief

(D-12), and therefore it should have been deemed waived or abandoned.

Moreover, the Court ignores that the SPA expressly prohibits waiver, unless such

waiver is in writing (SPA §12.17)(D-24, Ex. 1). Here, the LLC failed to produce any

writing in which Briarwood waived its right to claim over against the LLC for the "Cash"

attributable to the Georgia Medicaid Overpayments.

Furthermore, under New York law -- which applies to both the SPA (§11.3(a))(D-

24, Ex. 1) and the August 29, 2003 Letter Agreement (para 5)(D-24, Ex. 5) -- a waiver

can only occur where there "is an intentional relinquishment of a known right with full

knowledge of the facts upon which the right depends [citation omitted], Amrep Corp. v.

Am. Home Assurance Co., 81 A.D.2d 325, 329, 440 N.Y.S.2d 244, 247 (1st Dep't 1981);

Glenn v. Garth, 133 N.Y. 18, 35 (1892)(waiver can only "occur with full knowledge of

all the facts").

Here, by agreeing to pay certain limited Medicaid liabilities to one landlord to

avoid a protracted litigation (D-11, para 60), Briarwood did not intentionally and

knowingly waive its rights to recover approximately $9.5 million against the LLC for the

16

Georgia Medicaid Overpayments, especially absent a writing as required under SPA §
12.17.

### III. The Bankruptcy Court Erred In Denying Briarwood Reimbursement For Approximately $2 Million In Trust Fund Taxes For Employee Wages That Accrued Pre-Closing, Which The Debtors Failed To Pay

The Internal Revenue Code requires employers to withhold federal income and
social security taxes from their employees' wages. 26 U.S.C. §'s 3102 & 3402.  The
withheld taxes are deemed to be a special fund held in trust for the Government's benefit,
and  are commonly called "trust fund taxes." 26 U.S.C. §7501(a); Gephart v. United
States of America, 818 F.2d 469, 472 (6th Cir. 1987); (D-21, pp. 11-12).

Section 7501(a) provides in relevant part that:  "Whenever any person is required
to collect or withhold any internal tax from any other person and to pay over such tax to
the United States, the amount of tax so collected or withheld shall be held to be a special
fund in trust for the United States."

The "trust fund taxes" are for the Government's exclusive use and the employer
may not use such funds for any other purpose. Gephart, at 472; In re Sykes & Sons, Inc.,
188 B.R. 507, 513 (Bankr. E.D. Pa. 1995). The employer is further required to deposit the
employment taxes in a government-approved depositary bank and report the amount
collected to the IRS. 26 C.F.R. §31.6302-1; (D-21, p. 13).

Moreover, 26 U.S.C. §6672 provides that "any person" who wilfully fails to
account for and pay over withholding taxes shall be liable for the full amount not paid
over to the Government. Gephart, supra, 818 F.2d at 473. The Internal Revenue Code
also imposes criminal penalties, including up to five (5) years imprisonment, on any
responsible person who wilfully fails to pay withheld taxes.  26 U.S.C. §7501(a).

17

**A.    The Bankruptcy Court Ignored That SPA §5.1 Required The Debtors To Comply With All Legal Requirements, And/Or Precluded Them From Incurring Debt In Excess of $250,000, Which They Failed To Do, And Which Constitute Excluded Liabilities**

Aside from federal statutory law and regulations, the SPA also required the Debtors to pay the Trust Fund Taxes. For example, SPA §5.1 (D-24, Ex. 1) required that the Debtors, between execution of the SPA and the Closing, operate each facility in compliance with all applicable "Legal Requirements", which mean "all laws, statutes, ordinances, bylaws, codes, rules, regulations, restrictions .... promulgated or issued by any Governmental Authority...." (SPA §1.1)(D-24, Ex. 1). Thus, the Debtors were likewise required under the SPA to (a) withhold and remit the Trust Fund Taxes; and (b) deposit the Trust Fund Taxes in a government-approved bank. 26 C.F.R. §31.6302-1.

SPA §5.1(g) further precluded the Debtors, between execution of the SPA and the Closing, from incurring any debt in excess of $250,000 (D-24, Ex. 1). Nevertheless, the Debtors incurred and/or failed to remit approximately $2 million in Trust Fund Taxes from their employees (D-21, p. 5). Moreover, the bankruptcy court found that "(n)o funds were actually withheld for the taxes at issue or segregated by the Debtors in a payroll account or any other account" (D-21, p. 10).

Thus, the Trust Fund Taxes constitute liabilities under the SPA (§'s 5.1 & 5.1[g]), which are "Excluded Liabilities" for which the LLC is liable (D-24, Ex. 3).

Furthermore, the bankruptcy court did not dispute that SPA Article V provisions (such as §'s 5.1 & 5.1[g])(D-24, Ex. 1) constitute affirmative obligations which survive the Closing (D-21, p. 10). Rather, the bankruptcy court erroneously limited §5.1 to merely requiring the Debtors to operate in the ordinary course of business between execution of the SPA and the Closing (D-21, p. 10). Thus, the bankruptcy court ignored

18

that §5.1 required the Debtors to comply with all legal requirements, which required the

Debtors to (a) withhold and remit the Trust Fund Taxes; and (b) deposit the Trust Fund

Taxes in a government-approved bank. The bankruptcy court also overlooked that §5.1

precluded the Debtors from incurring debt in excess of $250,000. Consequently, the

bankruptcy court erred in ruling that IHS did not breach § 5.1 (D-21, p. 11), which

creates an "Excluded Liability" for which LLC is liable (D-24, Ex. 3).

**B.**    **The Debtors' Improper Failure To Segregate The Trust
Fund Taxes, Does Not Change Their Status As Either "Trust Funds",
"Related To Cash" Or "Pre-paid Items" Or "Deposits"**

The Debtors were required to "deposit" the Trust Fund Taxes. 26 C.F.R.

§31.6302-1. Furthermore, the Trust Fund Taxes are clearly in the nature of "deposits", as

they are held to be a special fund in trust for Governmental Authorities. 26 U.S.C.

§7501(a).

Thus, the Trust Fund Taxes constitute "deposits" which are a "Cash" exclusion

under SPA Schedule III (D-24, Ex. 2), and should have been turned over to Briarwood at

Closing. The Trust Fund Taxes also constitute "Liabilities relating to Excluded Assets" of

IHS, i.e., the "Cash" withheld from employees, which should have been used to pay the

Trust Fund Taxes (D-24, Ex. 3). "Liabilities relating to Excluded Assets" are also

"Excluded Liabilities" (Id.).

The bankruptcy court essentially ruled that the Trust Fund Taxes were neither

"trust funds", "related to cash", nor "prepaid items and deposits", because the Debtors did

not segregate any funds for the withholding taxes in any bank account (D-21, pp. 12-14).

The bankruptcy court erred, however, since the Debtors' improper failure to segregate the

19

Trust Fund Taxes, does not change their status as either "trust funds", "related to cash" or "pre-paid items" or "deposits".

## CONCLUSION

For the reasons set forth above, Briarwood respectfully requests that this Court (a) reverse the portion of the Bankruptcy Court's June 20, 2006 Order which denied Briarwood (i) reimbursement from the LLC for the Trust Fund Taxes and Georgia Medicaid Overpayments; and (ii) the release of Post-Closing Medicare Receivable; and render judgment in favor of Briarwood, thereby holding that, (iii) the LLC is liable to pay Briarwood for the Trust Fund Taxes and Georgia Medicaid Overpayments; and (iv) Briarwood is entitled to the release of the Post-Closing Medicare Receivable; (b) in the alternative, reverse the bankruptcy court's June 20, 2006 Order and remand the case to the bankruptcy court for further proceedings, or provide an other relief that the Court deems fit.

Respectfully submitted this 7th day of February 2007.

**DUANE MORRIS**

Frederick B. Rosner
(ID No.3995)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel: (302) 657-4900
Fax: (302) 657-4901

- and -

**BACKENROTH FRANKEL &
KRINSKY LLP**
Abraham Backenroth
489 Fifth Avenue, 28th Floor
New York, New York 10017
Tel: (212) 593-1100
Fax: (212) 644-0544

*Attorneys for Appellant, Abe Briarwood
Corporation*

# UNPUBLISHED OPINION

Not Reported in F.Supp.2d, 2004 WL 302303 (D.Del.), 42 Bankr.Ct.Dec. 169

Motions, Pleadings and Filings

United States District Court,
D. Delaware.
In re: DIRECTV LATIN AMERICA, LLC Debtor.
RAVEN MEDIA INVESTMENTS LLC, Appellant,
v.
DIRECTV LATIN AMERICA, LLC, Appellee.
No. 03-10805 (PJW), Civ. 03-981-SLR.
Feb. 4, 2004.

William H. Sudell, Jr., and Robert J. Dehney, of Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, for Appellant, Lawrence O. Kamin, and Alan J. Lipkin, of Willkie Farr & Gallagher LLP, New
York, New York, of counsel.
Joel A. Waite, and M. Blake Cleary, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware,
for Appellee, Lawrence K. Snider, Stuart M. Rozen, Fern C. Bomchill, and Sean T. Scott, of Mayer,
Brown, Rowe & Maw LLP, Chicago, Illinois, of counsel.
Laura Davis Jones, of Pachulski Stang Ziehl Young Jobes & Weintraub P.C., Wilmington, Delaware, for
Appellee Official Committee of Creditors Holding Unsecured Claims. Marc, A. Beilinson, and Brad R.
Godshall, of Pachulski Stang Ziehl Young Jobes & Weintraub P.C., Los Angeles, California, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.
I. INTRODUCTION
*1 On October 24, 2003, appellant Raven Media Investments LLC ("Raven") filed this appeal from the
August 22, 2003 bankruptcy court order to subordinate any claims of Raven arising from a put
agreement ("the Put Agreement") between debtor-appellee DirecTV Latin America LLC ("DTLVA").
(D.I.1) The court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1). The facts on
appeal are undisputed and the issue before the court is whether the bankruptcy court erred in
granting DTLVA's motion to subordinate Raven's contract claim pursuant to 11 U.S.C. § 510(b).
Because the court concludes that Raven's claim is outside the scope of § 510(b), the bankruptcy
court's decision shall be reversed.
II. STATEMENT OF FACTS
A. Procedural History
DTLVA filed a voluntary petition for under Chapter 11 of the Bankruptcy Code on March 18, 2003.
That same day, DTLVA filed a motion for an order authorizing rejection of the Put Agreement and
subordinating any claims arising from the Put Agreement pursuant to 11 U.S.C. § 510(b). (D.I. 6 at
1-10) Raven filed its objection to DTLVA's motion to reject and subordinate on April 4, 2003. On July
11, 2003, DTLVA filed a motion for summary judgment subordinating the claims, which was opposed
by Raven. (Id. at 51-88) On August 6, 2003, the bankruptcy court held a hearing on the summary
judgment motion and ruled from the bench, granting DTLVA's motion to reject and subordinate
Raven's claim. (Id., ex. G)
B. Factual Background
DTLVA provides direct-to-home satellite television entertainment in Latin America. DTLVA's services
are distributed in Argentina through Galaxy, a local operating company. DTLVA is a privately held
company primarily owned by Hughes Electronics Corp., Inc. ("Hughes"). Raven is a wholly owned
subsidiary of Grupo Clarin, Inc. ("Grupo Clarin"), an Argentine communications company.
During the period of October 30, 1997 through November 10, 2000, DTVLA and DTVLA Holdings, Inc.,
owned a forty-nine percent (49%) interest in Galaxy. The remaining fifty-one percent (51%) of
Galaxy was then owned by Plataforma Digital, S.A. ("Plataforma"), another wholly owned subsidiary
of Grupo Clarin. Due to some restructuring among Grupo Clarin subsidiaries, Plataforma's interests
related to DTVLA were transferred to Raven.
As a result of conflicts between Raven and DTVLA concerning the operation of Galaxy, the companies
began exploring options to terminate their joint venture. In February 2000, DTVLA expressed its
interest in acquiring Raven's interest in Galaxy. In September 2000, several meetings took place

between the parties and Mogan Stanley, DTVLA's financial advisor, to discuss the potential transaction. The parties negotiated a purchase price for Raven's interest in Galaxy of $170 million; that price was subsequently reduced to $169 million.

On November 10, 2000, the parties executed a stock purchase agreement ("the Stock Purchase Agreement") and the Put Agreement. (D.I.6, ex. A) On April 30, 2001, the parties executed a limited liability company admission agreement, subsequently amended by an amended and restated limited liability agreement ("LLC Agreement"). (*Id.*)

*2 Pursuant to the Stock Purchase Agreement, DTVLA purchased Raven's interest in Galaxy in exchange for a four percent (4%) membership interest in DTVLA and the rights under the Put Agreement. The percentage interest conveyed to Raven resulted from an apparent unilateral determination by DTVLA, without discussion or an independent valuation. [FN1]

> FN1. If four percent (4%) reflected an accurate valuation, than Galaxy would have had a worth of approximately $4.25 billion, which at that time would have accounted for twenty-seven (27%) of Hughes's market capitalization. (D.I. 6 at 92)

Under the LLC Agreement, DTVLA's interest was subject to certain restrictions including: (1) the requirement that DTVLA approve any sale of Raven's interest to a competitor; (2) a right of first refusal granted to other members on any third-party sale of Raven's interest; and (3) drag-along rights (e.g., DTVLA's right to require Raven to sell its interest at the same time and on the same terms as the majority interest holder, provided those terms are no less than the amount of the Put Agreement). (D.I.6, ex. A, B) Pursuant to the parties' agreements, Raven was also required to sign an irrevocable proxy in favor of the other DTVLA members with respect to any matter requiring a supermajority vote. (*Id.*)

The parties' agreements also exempted Raven from the DTVLA's restriction on a member's ability to pledge its interest in DTVLA, and Raven held no obligation to make capital contributions to DTVLA, and would not suffer dilution as the result of other member's contributions. (*Id.*) Further, Raven did not receive notice of DTVLA meetings, decisions made at those meetings, or the exercise of Raven's proxy. Raven did not receive a position on DTVLA's governing executive committee, and was not consulted in any manner with respect to DTVLA affairs.

Under the Put Agreement, Raven could exercise its option during a ten-day period in November 2003, three years after the date the agreement was executed. The Put Agreement fixed the amount DTVLA was required to pay to a base purchase price of $169 million, plus interest at approximately five percent (5%) per annum, for a total price of $194.8 million. (*Id.*, ex. A) DTVLA's obligation to pay could also be triggered by certain accelerating events, including whether DTVLA or any of its significant subsidiaries "shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." (*Id.*, ex. A at 7) Other accelerating events including certain DTVLA mergers or consolidations unrelated to DTVLA's financial condition.

DTVLA has stipulated, for purposes of its summary judgment motion, that a put accelerating event occurred more than two months prior to the petition date. Under the Put Agreement, the option was automatically deemed to be exercised, and any requirements of presentment, demand, protest, or similar notices were expressly waived by DTVLA. (*Id.* at 8) Consequently, as of January 8, 2003, Raven held a contract claim under the Put Agreement in the amount of $169 million exclusive of interest.

III. STANDARD OF REVIEW

In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercises 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." ' *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d Cir.1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which

effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir.2002).

**\*3** In the present case, Raven contends that the bankruptcy court committed legal error and, thus, the de novo standard of review applies.

IV. DISCUSSION

Section 510(b) of the Bankruptcy Code provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

In *In re Telegroup, Inc.*, the United States Court of Appeals for the Third Circuit considered whether a post-issuance contractual breach of a stock purchase agreement is within the scope of § 510(b). 281 F.3d 133 (2002). In that case, the shareholders alleged that the company had breached its contractual obligation to use good faith efforts to register the stock. Had the company done so, the shareholders might have mitigated their losses when the company began to decline.

In construing § 510(b), the Third Circuit first concluded that the statute's plain language was ambiguous. *Id.* at 138. The legislative history suggested that the congressional intent was to prevent shareholders from using allegations of securities fraud to bootstrap their claims in an effort to avoid the effect of the absolute priority rule. Otherwise, such claims might permit shareholders to avoid the statutory design to treat shareholders as residual claimants. *Id.* at 142. As residual claimants, the Bankruptcy Code requires that shareholders bear the risk of unlawful conduct which results in a loss of share value. *See id.* at 143. Central to the Third Circuit analysis is that equity investors choose to participate in profits and, in exchange, assume the risk of business failure; this is the distinguishing factor between equity and creditors and justifies the subordination of certain claims in bankruptcy. *See* at 142.

Nonetheless, simply being a holder of equity interest would be too broad of a basis to justify subordination of claims, just as limiting subordination to only tort claims would prove too narrow. As a result, the Third Circuit applied a hypothetical securities fraud test to the shareholders' claims. *See id.* at 143. In *Telegroup*, the post-issuance breach alleged by the shareholders was the debtor's failure to use good faith efforts to register the stock. The court reasoned that the same essential claim could be brought as securities fraud if, at the time of purchase, the shareholder was told the company was using its best efforts to register the stock. In the latter case, the shareholder's claim would be subordinated. The court held that since the asserted contract claims were indistinguishable from a hypothetical securities fraud claim, they too were within the scope of § 510(b). *Id.* The court concluded that "[s]ince claimants in this case are equity investors seeking compensation for a decline in the value of Telegroup's stock, we believe that the policies underlying § 510(b) require resolving textual ambiguity in favor of subordinating claims." *Id.* at 142.

*4 Applying the Third Circuit's hypothetical securities fraud claim test, this court concludes that the present case is distinguishable from *Telegroup* and from the scope of claims covered by § 501(b). As an initial matter, the transaction's structure clearly shows that Raven did not seek to hold an equity interest in DTVLA. The transaction was structured such that Raven did not participate in the entity's management. Raven's interest was apportioned not based upon a fair valuation of DTVLA, but apparently upon an arbitrary figure. Raven was excused from capital contributions required of other LLC participants, and its interest was subject to certain restrictions on transferability. Raven did not participate in LLC management and was not informed of the business affairs of DTVLA or even the exercise of its proxy. These are not conditions consistent with a purchase of equity, and certainly not consistent with an equity investment in the amount of approximately $170 million. Raven's interest also received unique treatment in that it was exempt from certain member restrictions, enabling it to monetize the holdings and obtain immediate cash. Most importantly, it is indisputable that the transaction was so structured that Raven would not bear the risk of illiquidity or insolvency. In sum, while Raven held equity in name, it possessed few of the characteristics consistent with that status.

The essence of the asserted claim in the present case is distinguishable from *Telegroup.* In that case, the contract claim could have been brought as a misrepresentation claim and the damages would be predicated upon diminished share value. *Telegroup,* 281 F.3d at 143. In contradistinction, Raven asserts a claim neither predicated upon misleading statements nor measured by diminished share value. Raven's right to payment arose without respect to actionable conduct by DTVLA, and without relation to the present value of its interest in DTVLA.

DTVLA contends that, as the Put Agreement simply gave Raven the right but not an obligation to sell its interest back to DTVLA, it participated in the profits and, therefore, falls within the scope of *Telegroup.* (D.I. 12 at 12) While participation in profits is a critical aspect of an equity interest, participation in the risk of loss is similarly crucial. *See Telegroup,* 281 F.3d at 139-42. In the present case, DTVLA can not reasonably assert that the transaction, as structured, was intended to expose Raven to any risk of loss. Consequently, § 501(b) should not subordinate Raven's claim for payment under the Put Agreement.

To be clear, the court does not conclude that a shareholder's possession of a put option to the debtor alone relieves a holder of equity of the effect of the absolute priority rule. The application, however, of a simple bright-line test is not consistent with the Third Circuit's analysis in *Telegroup. See Telegroup,* 281 F.3d at 144 n. 2. Instead, *Telelgroup* counsels the court to consider whether subordinating the claim furthers the anti-bootstrapping intent of § 510(b) so that those who have contractually accepted the risk of business failure, bear that burden in bankruptcy. In the present case, the court concludes that the purpose of § 510(b) is not served by imposing the risk of business failure upon a party that unequivocally did not contract for it.

IV. CONCLUSION

*5 For the reasons state above, the court concludes that the bankruptcy court's decision was in error and should be reversed. An order consistent with this

opinion shall issue.
D.Del.,2004.
In re DirecTV Latin America, LLC
Not Reported in F.Supp.2d, 2004 WL 302303 (D.Del.), 42 Bankr.Ct.Dec. 169

## Motions, Pleadings and Filings (Back to top)

• 1:03CV00981 (Docket) (Oct. 24, 2003)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.