IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., | ) | Case No. 00-389 (MFW) |
| et al., | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| ABE BRIARWOOD CORPORATION, | ) | |
| | ) | Civil Action No. 06-479 (GMS) |
| Appellant/Cross-Appellee | ) | |
| | ) | (Consolidated Lead Case) |
| v. | ) | |
| | ) | |
| IHS LIQUIDATING LLC, | ) | |
| | ) | |
| Appellee/Cross-Appellant | ) | |

## IHS LIQUIDATING LLC'S ANSWERING BRIEF
## AND BRIEF IN SUPPORT OF CROSS-APPEAL

KAYE SCHOLER LLP
Arthur Steinberg
Lester M. Kirshenbaum
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Joseph M. Barry (Del. Bar No. 4221)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
jbarry@ycst.com

Dated: May 3, 2007

Doc. #IHS - Brief

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    The Briarwood Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      B.    The LLC's Entitlement to Its Attorneys' Fees/The Counterclaim . . . . . . . . . . . . . . 8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      B.    The Original SPA Purchase Price, Actual Working Capital Adjustment
            and Medicaid Escrow Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      C.    The July 21 Stipulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      D.    The Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    IHS Operated In The Ordinary Course Of Its Business
            Through The Closing Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      B.    The Payroll Taxes Were Not Due Until After The Closing Date . . . . . . . . . . . . 15
      C.    The Medicaid Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      D.    The U.S. Global Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.     THE BANKRUPTCY COURT PROPERLY DENIED
       EACH OF BRIARWOOD'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      A.    The Payroll Taxes Were Not Due Until After The Closing Date . . . . . . . . . . . . 19
      B.    The Payroll Tax Liabilities Were Neither "Deposits" Nor "Prepaid Items"
            Within the Meaning Of the SPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      C.    Briarwood's Additional Arguments Have No Merit . . . . . . . . . . . . . . . . . . . . . 20

II.    THE BANKRUPTCY COURT CORRECTLY RULED THAT THE LIABILITY
       TO GEORGIA MEDICAID WAS BRIARWOOD'S OBLIGATION . . . . . . . . . . . . . . 23

      A.    The Liabilities To Georgia Medicaid Were Neither
            Prepaid Items Nor Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      B.    The Bankruptcy Court Correctly Held That Briarwood
            Has Already Conceded Its Liability To Georgia Medicaid . . . . . . . . . . . . . . . . . 27

III.    THE BANKRUPTCY COURT WAS CORRECT IN DETERMINING
        THAT THE SECOND CMS PAYMENT BELONGED TO THE LLC,
        NOT BRIARWOOD, PURSUANT TO THE TERMS OF THE U.S.
        GLOBAL SETTLEMENT AGREEMENT ................................... 29

        A.    The Bankruptcy Court Afforded Briarwood Ample Opportunity
              To Address The Merits Of The Second U.S. Global Settlement Claim ........ 31

STATEMENT OF ISSUE PRESENTED ON CROSS-APPEAL ......................... 32

ARGUMENT IN SUPPORT OF LLC'S CROSS-APPEAL ............................ 32

CONCLUSION ............................................................ 36

## TABLE OF AUTHORITIES

Page(s)

### CASES

*25 East 83 Corp. v. 83rd Street Assocs.,*
  213 A.D.2d 269 (N.Y. App. Div. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*Abrahamson v. Bd. of Educ. of the Wappingers Falls Cent. Sch. Dist.,*
  374 F.3d 66 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*Brenner v. World Boxing Counsel,*
  675 F.2d 445 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34, 35

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health and Human Resources,*
  532 U.S. 598 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*Diaz v. Rerio,*
  2000 WL 502852 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

*Great Earth Int'l Franchising Corp. v. Milks Dev.,*
  2004 U.S. Dist. LEXIS 18366 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*Harris v. City of Philadelphia,*
  35 F.3d 840 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

*Kuk Je Medical Corp. v. Home Diagnostics, Inc.,*
  1994 WL 465844 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*LaRouche v. Kezer,*
  20 F.3d 68 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*Lowy v. Bay Terrace,*
  869 F.2d 173 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

*MTX Comm. Corp. v. LDDS/Worldcom, Inc.,*
  2001 U.S. Dist. LEXIS 7912 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

*Maine School Admin. Dist. No. 35 v. Mr. and Mrs. R.,*
  321 F.3d 9 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*Meinwald v. Meinwald,*
  56 A.D. 2d 565 (N.Y. App. Div. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

*Scientific Holding Co. v. Plessey, Inc.,*
  510 F.2d 15 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34, 35

Page(s)

*Terrydale Liquidating Trust v. Herbert Barness*,
     645 F. Supp. 920 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Tyler v. O'Neil*,
     2004 U.S. App. LEXIS 21308 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Visiting Nurse Ass'n of Western Pennsylvania*,
     101 B.R. 462 (Bankr. W.D. Pa. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

IHS Liquidating LLC (the "LLC"), the successor in interest to certain rights and liabilities of Integrated Health Services Inc. ("IHS" or the "Debtor") submits this brief in opposition to the appeal of Abe Briarwood Corporation ("Briarwood") from the decision and order of the United States Bankruptcy Court for the District of Delaware dated June 20, 2006 (the "Bankruptcy Court Decision") (Br-1), and in support of its cross-appeal (the "Cross-Appeal").[1]

## PRELIMINARY STATEMENT

Pursuant to the January 28, 2003 Stock Purchase Agreement, as amended (the "SPA"), IHS sold substantially all of its operating healthcare businesses to Briarwood, through the transfer of the stock of two newly-formed entities (the "Purchased Subsidiaries"). Briarwood's original purchase price was $110,500,018 (the "Original Purchase Price"), subject to certain upward or downward adjustments. However, in settlement of a number of pre-Closing disputes, the parties entered into a Bankruptcy Court-approved stipulation, dated July 21, 2003 (the "July 21 Stipulation"), which, among many other things, reduced the Original Purchase Price by $15.5 Million, to $95,000,018 (the "Adjusted Purchase Price"), and Briarwood agreed to forego certain potential adjustments which could have resulted in a reduction of the cash received by the LLC. The adjustments waived by Briarwood included, *inter alia*, the setting up of an escrow account, funded with $7.5 Million from the Original Purchase Price (the "Medicaid

---

[1] Citations to documents contained in *Appellant's Designation of Items to be Included in the Record on Appeal and Statement of Issues for Appeal* are referred to herein as "Br-." Citations to documents contained in *Appellee/Cross-Appellant IHS LLC's Designation of Additional Items to be Included in the Record on Appeal and Statement of Issues on Cross-Appeal* are referred to herein as "LLC-".

Escrow"), for the purpose of paying "Medicaid recoupments coming due post-Closing but relating to pre-Closing periods...." The July 21 Stipulation also provided, *inter alia*, that the last day to close on the SPA was August 31, 2003 (a Sunday).

On Friday, August 29, 2003, Briarwood failed to deliver the full remaining amounts due under the SPA; it was clear that Briarwood could not close by August 31; and IHS declared Briarwood to be in default under the SPA. Nevertheless, on September 2, 2003, after further negotiations, the parties closed on the SPA, effective as of August 29, 2003 (the "Closing Date"). As a condition to agreeing to close subsequent to Briarwood's August 29, 2003 default, and to minimize the chance of any post-Closing disputes with Briarwood, IHS and its official committee of unsecured creditors (the "Creditors' Committee") insisted that the parties enter into a further agreement dated as of August 29, 2003 (the "SPA Closing Agreement"), pursuant to which Briarwood paid IHS an additional $3 Million, and the parties agreed to waive the SPA provision providing for a post-Closing Working Capital adjustment. That adjustment would have been based on whether the Actual Working Capital[2] transferred to Briarwood at Closing was above or below $62 Million. Subject to a $7.5 Million cap in either direction, Briarwood would pay the LLC for the full amount that the Actual Working Capital exceeded $62 Million; alternatively, the LLC would pay Briarwood for the full amount that the Actual Working Capital fell below it. The basic definition of Working Capital was all Accounts Receivable less all Accounts Payable. Ironically, the Actual Working Capital transferred to Briarwood was

---

[2]    Capitalized terms used but not specifically defined herein shall be given the meanings ascribed to them in the SPA.

determined to be $66 Million. Thus, Briarwood received more Actual Working Capital than it bargained for.

Not satisfied with the $15.5 Million purchase price reduction which it had already negotiated pursuant to the July 21 Stipulation and the greater amount of Actual Working Capital that it received at Closing, in early December 2004, fifteen months after the Closing Date, Briarwood filed a motion with the Bankruptcy Court (the "Adjusted Purchase Price Reduction Motion") seeking, in effect, to reduce the Adjusted Purchase Price by an additional $38 Million (*i.e.*, over 40%). In that motion, Briarwood baselessly asserted the following five claims against the LLC (collectively, the "Briarwood Claims") (i) $2 Million for payroll tax obligations which became due after the Closing Date (the "Payroll Tax Claim"); (ii) $9.4 Million on account of recoupment claims asserted by Georgia Medicaid (the "Medicaid Claim"); (iii) $9 Million for miscellaneous trade vendor payables (the "Vendor Payables Claim"); (iv) $17.1 Million (the "U.S. Global Settlement Payment Claim") received by the LLC from the United States Centers for Medicare and Medicaid Services ("CMS") after the Closing Date (the "First CMS Payment") – which, by prior agreement and arrangement, was promptly used by the LLC to fund all but $2 Million of a $19.1 Million payment by the LLC to the United States Department of Justice pursuant to the terms of a global settlement agreement between the United States and IHS (the "U.S. Global Settlement Agreement"); and (v) $350,000 for an administrative expense claim that was allowed after the Closing pursuant to a settlement agreement that Briarwood ratified (the "IOS Claim"). Had Briarwood succeeded in its maneuver, Briarwood would have ended up paying only $57 Million for a very large, going concern business which contained, aside from many other things, Actual Working Capital of over $66 Million.

The LLC and the Creditors' Committee vigorously opposed every aspect of Briarwood's Adjusted Purchase Price Reduction Motion, and the LLC also cross-moved asserting counterclaims (the "Counterclaims") against Briarwood for (i) reimbursement of the LLC's attorneys' fees and costs in connection with defending against Briarwood's ill-conceived motion, pursuant to section 11.11 of the SPA (the "Attorneys' Fees Counterclaim"), (ii) rescission of the SPA, but only in the event Briarwood prevailed on any of its claims (the "Rescission Counterclaim"), (iii) reimbursement of the LLC's net out of pocket expenses (the "Reimbursement Counterclaim") that the LLC incurred in paying the federal government the sum of $19.1 Million under the U.S. Global Settlement Agreement, but only in the event Briarwood prevailed on its U.S. Global Settlement Payment Claim, (iv) an order determining that Briarwood was responsible to pay a third party's administrative expense claim of $25,000 (to the extent that claim proved to be valid), after Briarwood had improperly told the claimant to seek payment from the LLC (the "Third Party Reimbursement Counterclaim"), and (v) an order directing Briarwood (a) to replace approximately $7.4 Million in letters of credit that IHS had previously posted early in the bankruptcy case and which Briarwood was required under the SPA to replace, and (b) to reimburse the LLC for the costs of maintaining the letters of credit since the Closing Date (the "LC Counterclaim").

Chief Bankruptcy Judge Walrath held a two-day trial (the "Trial") on this matter during the Summer 2005.  (Br-5, 7).  The LC Counterclaim was severed from the Trial and remains pending before the Bankruptcy Court.

On January 26, 2006, while the matter remained *sub judice* with the Bankruptcy Court, Briarwood filed another motion (the "Second U.S. Global Settlement Payment Claim")

for an order declaring that Briarwood was also entitled to an additional payment of $1,554,815.41 which the LLC had received during the Fall 2005 from CMS (the "Second CMS Payment", and together with the First CMS Payment, the "Two CMS Payments").  On February 3, 2006, the LLC filed its opposition to Briarwood's Second U.S. Global Settlement Payment Claim.  At the February 7, 2006 hearing on that matter, the Bankruptcy Court agreed with the LLC that the issues concerning the parties' entitlement to the Two CMS Payments were the same, and therefore would be covered in one ruling.  (Br-19 at pp. 38-39).

On June 20, 2006, Judge Walrath, who has presided over every aspect of the IHS bankruptcy case since inception, issued a comprehensive and detailed opinion denying all of Briarwood's claims, including its claim to the Second CMS Payment.  With respect to the LLC's Counterclaims, the Bankruptcy Court (i) found that the Rescission Counterclaim was moot since all of the Briarwood Claims were denied, (ii) did not address the Reimbursement Counterclaim (presumably because the denial of the U.S. Global Settlement Payment Claim rendered the Reimbursement Counterclaim moot as well), and (iii) found that the LLC was not responsible for the claim which was the subject of the Third Party Reimbursement Counterclaim, but declined to direct Briarwood to pay the $25,000 to the claimant because no evidence was presented concerning the amount actually due to that third party.  Finally, the Bankruptcy Court also denied the Attorneys' Fees Counterclaim because, according to the Court, although the LLC had defeated all of the Briarwood Claims, the LLC was not the "prevailing party" in this litigation. (Br-21 at pp. 37-42).

In its appeal Briarwood has abandoned the Vendor Payables Claim, the IOS Claim and the U.S. Global Settlement Payment Claim, but continues to pursue the Payroll Tax Claim,

the Medicaid Claim and the Second U.S. Global Settlement Payment Claim. The LLC cross-appeals from the Bankruptcy Court's denial of the Attorneys' Fees Counterclaim (LLC-1).

### SUMMARY OF THE ARGUMENT

**A.**    <u>**The Briarwood Appeal**</u>

The Bankruptcy Court correctly denied Briarwood's Payroll Tax Claim. The extensive Trial record established that the payroll taxes for which Briarwood seeks reimbursement were not due until September 2 or September 4, 2003, *i.e.*, subsequent to the Closing Date. Under the SPA, IHS simply warranted that it would pay taxes which were due prior to the Closing Date. All taxes becoming due thereafter were Briarwood's obligations. The unrebutted evidence also established that Briarwood was well aware that taxes which were not due until after the Closing Date (even if related to the pre-Closing period), were to be paid by Briarwood, and would be part of the post-closing Working Capital Adjustment (which was waived pursuant to the SPA Closing Agreement).

The Bankruptcy Court also properly rejected Briarwood's Medicaid Claim. Under the July 21 Stipulation, Briarwood agreed to forego the establishment of the Medicaid Escrow (which would have been used to pay Medicaid recoupment claims relating to the pre-Closing period) in return for the $15.5 Million purchase price reduction. Under section 5.16 of the SPA, as modified by the July 21 Stipulation, IHS simply agreed to pay any "Medicaid recoupments prior to the Closing in the Ordinary Course of Business." The Bankruptcy Court determined, based on the overwhelming Trial record, that IHS paid all of its obligations in the ordinary course of its business through the Closing Date, and that it would not have been in IHS' ordinary course of business to pay Georgia Medicaid prior to the Closing Date. Moreover, consistent with the

Bankruptcy Court's express findings related to the Payroll Taxes, the Bankruptcy Court found

that Briarwood knew well in advance of the Closing Date that IHS would not pay Georgia

Medicaid prior to the Closing Date, and that IHS' payables relating thereto would be part of the

post-Closing Working Capital Adjustment calculations.  In addition, and very significantly as it

relates to Briarwood's bona fides, the Bankruptcy Court specifically found, and held, that in an

earlier contested hearing on the issue of whether Briarwood or the LLC was responsible to pay

Georgia Medicaid, Briarwood had expressly conceded on the Bankruptcy Court record that

Briarwood was the responsible party.  The Bankruptcy Court therefore held that Briarwood was

estopped from re-raising that issue.

The Bankruptcy Court was also correct in denying Briarwood's Second U.S.

Global Settlement Payment Claim.  The Bankruptcy Court found, based on the Trial record and

the many prior hearings related to this issue, that Briarwood understood and agreed that all of the

amounts paid by CMS to IHS and/or to the LLC were to be netted against the $19.1 Million

payment made by the LLC to the Federal Government, as part of the U.S. Global Settlement

Agreement.  At the end of the day, the LLC was still in a negative $500,000 position resulting

from the cash which it paid to and received from the Federal Government (from the Two CMS

Payments).

Based on the foregoing and the further discussion below, the portions of the

Bankruptcy Court Decision denying Briarwood's claims should be affirmed in toto.

**B.     The LLC's Entitlement to Its Attorneys' Fees/The Counterclaim**

With due respect, however, the Bankruptcy Court erred in denying the LLC's

Attorneys' Fees Counterclaim.  In successfully defending against all of the Briarwood Claims,

the LLC was the "prevailing party" in this litigation within the meaning of section 11.11 of the SPA, and under applicable caselaw precedent.

Briarwood instituted this litigation in which it first sought approximately $38 Million from the LLC (and then separately sought an additional $1.55 Million through the Second U.S. Global Settlement Payment Claim) – all purportedly due to Briarwood under the SPA. The LLC was forced to expend substantial sums in successfully defending against Briarwood's claims, and having them rejected in toto. This is the very circumstance expressly covered by section 11.11 of the SPA, which plainly provides that:

> Section 11.11 <u>Attorneys' Fees and Costs</u>. Should either party institute any arbitration, action, suit or other proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to receive from the losing party reasonable attorneys' fees and costs incurred in connection therewith.

Without citation to any authority, the Bankruptcy Court held that the LLC was not the prevailing party in this litigation, and therefore not entitled to its attorneys' fees, solely on the basis that the LLC was not awarded a monetary recovery on the Third Party Reimbursement Counterclaim. In actuality, that counterclaim also was decided in favor of the LLC. The primary purpose of that counterclaim was to obtain a ruling that Briarwood, and not the LLC, was responsible for a $25,000 claim asserted by a third party, to the extent that it proved to be a valid claim. At Trial, the LLC did not attempt to establish the correct amount of that claim. Rather the LLC simply introduced evidence establishing that the claim had been asserted against Briarwood, and that Briarwood had taken the position that the LLC was responsible to pay it. The Bankruptcy Court <u>agreed</u> with the LLC that Briarwood was responsible to pay the claim to the extent it proved to be valid. (Br-21 at pp. 39-41).

Moreover, even assuming *arguendo* that the LLC was not the "prevailing party" as it relates to the Third Party Counterclaim, the LLC still was the "prevailing party" in defeating all the Briarwood Claims. Therefore, the Bankruptcy Court clearly erred in denying the LLC's Attorneys' Fees Counterclaim.

## STATEMENT OF FACTS

### A.    Introduction

Pursuant to its Plan of Reorganization, IHS implemented certain transactions, the cornerstone of which was the consummation of the SPA. (Br-21 at p. 2). Pursuant to the Plan and SPA, IHS transferred substantially all of its assets and liabilities to the Purchased Subsidiaries and sold the stock of those subsidiaries to Briarwood. (*Id.*). The SPA closed effective as of August 29, 2003. (*Id.*).

### B.    The Original SPA Purchase Price, Actual Working Capital Adjustment and Medicaid Escrow Amount

The Original Purchase Price of $110,500,018 was subject to certain upward or downward adjustments, including an adjustment if the Actual Working Capital transferred to Briarwood at Closing was different from the baseline of $62 Million. *See* SPA (Br-1, Ex. 1) at § 2.4. The Actual Working Capital calculation took into account, among other things, all outstanding tax obligations, Medicaid overpayment liabilities, and obligations to trade vendors as of the Closing Date. (*Id.* at p. 12). Specifically excluded from the Actual Working Capital calculation were (i) all Excluded Assets and Excluded Liabilities which might otherwise be considered current assets or current liabilities, and (ii) all Medicare related payables and receivables that were being dealt with under the U.S. Global Settlement Agreement. (*Id.*).

The SPA also originally provided for the establishment of the Medicaid Escrow to be funded at Closing from the Original Purchase Price. *See* SPA (Br-1, Ex. 1) at §§ 2.2(b)(i), 5.16. Pursuant to the original version of Section 5.16 of the SPA, any Medicaid recoupment claims coming due post-Closing but relating to pre-Closing periods were to be paid out of the Medicaid Escrow, with the balance in that account to be released to IHS on the first anniversary of the Closing Date. (*Id.* at § 5.16).

## C.    The July 21 Stipulation

The SPA originally provided that the Closing would occur by July 31, 2003. *See* SPA (Br-1, Ex. 1) at § 2.3. By June 2003, Briarwood had breached the SPA in several respects, and it was clear that Briarwood could not close by July 31. (Br-12 at p. 9). IHS therefore terminated the SPA pursuant to section 9.1(f) thereof.[3] Following extensive litigation and negotiations, the parties entered into the July 21 Stipulation, which reinstated the SPA and modified certain of its terms. (Br-2, Ex. C).

Among many other things, the July 21 Stipulation reduced the purchase price by $15.5 Million, and eliminated the Medicaid Escrow. *See* July 21 Stipulation (Br-2, Ex. C) at ¶¶21, 29. Also, with respect to the Working Capital adjustment, it was agreed that estimated Actual Working Capital would be deemed to be $62 Million, *i.e.*, equal to the Baseline Working Capital. (*Id.* at ¶4). The main purpose of this modification was to establish that the post-Closing Working

---

[3]    Section 9.1(f) of the SPA provided, in substance, that either party could terminate the SPA if it became highly unlikely that the other party would satisfy its obligations that were conditions to Closing by July 31. By June 2003, among other things, Briarwood had failed to take appropriate steps to procure the regulatory approvals necessary for Closing, and had created a number of other obstacles to Closing.

Capital adjustment would be based on the amount that Actual Working Capital as of the Closing Date varied from $62 Million. (*Id.*).

## D.    The Closing

The July 21 Stipulation set an outside Closing date of August 31, 2003. (Br-2, Ex. C, at ¶25), and the Closing was scheduled for August 29. (Br-7 at pp. 32-33). However, as of the close of business on August 29, Briarwood had failed to fund the full Adjusted Purchase Price, and it was clear that Briarwood could not satisfy the conditions to Closing by August 31. (Br-7 at pp. 33-34). At that point, IHS had the absolute right to terminate the SPA (Br-2 at ¶30), and IHS declared Briarwood to be in default. (Br-7 at pp. 33-34). However, IHS and the Creditors' Committee agreed to meet with Briarwood the following week to explore whether an alternative resolution could be reached. (*Id.*).

On September 2, 2003, following extensive negotiations, IHS agreed to close, effective as of August 29, 2003, subject to certain modifications to the SPA which were set forth in the SPA Closing Agreement. (Br-2, Ex. D).

Among other things, the SPA Closing Agreement provided that Actual Working Capital would be deemed to be $62 Million, and eliminated the post-Closing Actual Working Capital adjustment.

> The parties agree that the Closing Working Capital and the Actual Working Capital shall be equal to $62,000,000.00 and that there will be no adjustment to the Purchase Price based on Working Capital as of the Closing, notwithstanding any provision of the Stock Purchase Agreement and/or the [July 21] Stipulation to the contrary.

*See* SPA Closing Agreement (Br-2, Ex. D) at ¶4.

The primary purpose of both IHS and the Creditors' Committee in insisting upon this elimination of the Actual Working Capital adjustment was to ensure that the parties would part ways after the Closing with a definite purchase price that Briarwood could not later attempt to adjust. (Br-2 at ¶28; Br-7 at pp. 34-38, 41).

Ironically, according to the calculations done by IHS' former Controller subsequent to the Closing Date and reviewed by Briarwood's accountants, IHS' Actual Working Capital as of the Closing Date exceeded $66 Million. (Br-5 at p. 199; Br-7 at pp. 40-41; Br-21 at p. 8). Hence, had the parties not eliminated the Actual Working Capital adjustment pursuant to the SPA Closing Agreement, the Final Purchase Price under the SPA would have increased by more than $4 Million ($1 Million more than the $3 Million Briarwood paid pursuant to the SPA Closing Agreement). (Br-2 at ¶28; Br-5 at p. 199; Br-7 at pp. 40-41; Br-21 at p. 8).

## THE TRIAL

At the Trial, Briarwood put on three witnesses – Murray Forman, Briarwood's representative, and Bradley Bennett, IHS' former CFO, who also served as CEO for a number of months up through the Closing Date, and a representative from Georgia Medicaid. Briarwood used the testimony of those individuals mainly to show that either it had paid, or might in the future be responsible to pay, the sums which Briarwood sought from the LLC in the Briarwood Claims.

The LLC cross examined Mr. Bennett concerning IHS' operations and financial affairs, and IHS' adherence to, and compliance with, the SPA. The LLC also put on the live testimony of (i) William Johnsen, an outside consultant who served as IHS' Senior Vice President beginning in August 2000, (ii) Mark Fulchino, IHS' former Senior Vice President of

Tax, and (iii) Sean Nolan, IHS' former Controller, concerning IHS' compliance with the terms of the SPA, and IHS' continued adherence to operating in the ordinary course of business and consistent with applicable laws through the Closing Date. The LLC also introduced the deposition testimony of Mel Feder, Briarwood's accountant and consultant, with respect to the issue of Briarwood's knowledge and understanding that (i) Briarwood was responsible for paying (a) all tax obligations becoming due after the Closing Date, and (b) the amounts due to Georgia Medicaid; and (ii) as part of the U.S. Global Settlement Agreement and its implementation, the CMS payments would be received and kept by the LLC in consideration for its agreement to pay the Federal Government $19.1 Million. Finally, the LLC put on the live testimony of its expert witness Robert Rosenfeld, a practicing CPA and Certified Fraud Examiner, who has often served in the capacity of operating trustee or responsible officer for companies in financial distress. Mr. Rosenfeld gave extensive testimony on accounting matters relating, *inter alia*, to the Payroll Tax Claim and Medicaid Claim. It is noteworthy that Briarwood designated an expert Trial witness, Martin Leventhal, CPA, to rebut Mr. Rosenfeld's testimony. However, Briarwood did not put Mr. Leventhal on the stand even though he was present in court throughout the Trial.

The Bankruptcy Court found the live testimony of Messrs. Bennett, Johnsen, Fulchino, Nolan and Rosenfeld (along with the deposition testimony and documents authored by Mr. Feder) to be fully supportive of the LLC's position.[4]

---

[4]    The testimony of those witnesses as well as other evidence proffered at the Trial and considered by Judge Walrath is also discussed in the legal argument section below.

A.    **IHS Operated In The Ordinary Course Of**
      **Its Business Through The Closing Date**

        Each of IHS' former officers testified that at all times through the Closing Date, IHS operated its business, conducted its financial affairs, and paid its bills and expenses in the ordinary course of IHS' business and in compliance with applicable laws. (Br-5 at pp. 126-29, 167-68, 201-02; Br-7 at pp. 9, 18, 66-67).

        In his dual capacity as IHS' CEO and CFO, Mr. Bennett executed the certificate pursuant to section 6.3 of the SPA (the "IHS Compliance Certificate") certifying that (i) as of the Closing Date all of IHS' Representations and Warranties in the SPA remained "true and correct" and (ii) all of IHS' covenants and agreements under the SPA had been performed and complied with in all material respects. (Br-24, Ex. 4). Mr. Bennett expressly testified that he believed that the IHS Compliance Certificate was true at the time that he signed it (*i.e.*, September 2, 2003), and that he still believed that the certificate was true as of the date of his testimony (*i.e.*, July 13, 2006). (Br-7 at pp. 18, 24).

B.    **The Payroll Taxes Were Not Due Until After The Closing Date**

        Mr. Fulchino testified that he was in charge of IHS' taxes, including payroll taxes, for approximately 5 years through the Closing Date. (Br-7 at pp. 5-6). He further testified that IHS complied with all of its legal obligations with respect to paying payroll taxes through the Closing Date. (*Id.* at pp. 6-9). Specifically with regard to the Payroll Tax Claim, Mr. Fulchino testified that most of the payroll taxes covered by that claim became due on September 2 or 4, 2003, and were related to the August 29 payroll. (*Id.* at pp. 6-8). Mr. Fulchino explained that those payroll taxes were due either the first business day or the third business day after the

payroll was issued, and the first business day after Friday, August 29, 2003, was Tuesday, September 2, 2003. (*Id.*). IHS funded the August 29, 2003 net payroll from its revolving line of credit on that day, as it normally did; and no funds were withheld for the taxes or otherwise segregated by IHS. (*Id.* at pp. 6-8, 14-15).

The LLC's accounting expert, Mr. Rosenfeld, also testified that an employer's payroll tax payments are never due on the same day that the payroll checks are issued. (Br-7 at pp. 137-38). At the earliest they would be due on the first business day thereafter. (*Id.*). Mr. Rosenfeld further testified that IHS' practices with respect to the payment of withholding taxes were consistent with general business practice and in compliance with federal and state regulations. (Br-7 at pp. 125-27, 137-38).

**C.    The Medicaid Claim**

With respect to the issues concerning the liability to Georgia Medicaid, the LLC presented undisputed evidence that IHS acted, and paid its obligations, in the ordinary course of business through the Closing Date. (Br-7 at pp. 18, 66-67; Br-21 at p. 17). Messrs. Bennett and Johnsen specifically testified, that it would not have been the ordinary course of business for IHS to pay Georgia Medicaid prior to or at the Closing Date, even if the amount due was already agreed to between the parties. (Br-5 at pp. 140-41; B-7 at pp. 64-68). Typically that amount would be repaid over time through recoupments by Georgia. (Br-21 at 17-18; Br-25, Ex. 27, at pp. 19-27). This practice was confirmed by a Georgia Medicaid representative who testified at an earlier Bankruptcy Court hearing discussed below at pp. 27-28. (*Id.*).

The Trial record also established that Briarwood knew months in advance that IHS would not pay the liability to Georgia Medicaid prior to the Closing Date. Rather, those

payables were going to be part of the calculation of Actual Working Capital, and part of the Actual Working Capital adjustment. Messrs. Bennett, Nolan and Fulchino each testified that the Working Capital accounts included the accounts which recorded the payroll tax obligations and the Georgia Medicaid overpayment obligations. (Br-5 at pp. 104-105, 155-156, 158-159, 180, 186-187, 196, 204-205; Br-7 at pp. 11-12). Mr. Nolan also testified that he supplied Briarwood's accountant, Mel Feder, with the Working Capital calculations and personally reviewed those calculations with Mr. Feder line item by line item (Br-5 at pp. 169-70, 172-173), and that Mr. Feder specifically inquired about the liability to Georgia Medicaid. (*Id.* at pp. 202-03). Mr. Johnsen testified that he discussed the Georgia overpayments with Briarwood's President, Uri Kaufman, and advised him that the liability to Georgia Medicaid would flow through to Briarwood, and that liability would be part of the Actual Working Capital adjustment. (Br-5 at pp. 41-44).

In an attempt to rebut that overwhelming and conclusive testimony, Briarwood put in evidence a single piece of paper, *i.e.*, a letter dated August 28, 2003, addressed to IHS in which Georgia Medicaid asserted its claim. (Br-24, Ex. 18). Briarwood argues that this letter should have resulted in an immediate payment of more than $9 Million to Georgia. However, no evidence was presented by Briarwood to establish that IHS even received the letter, or, assuming that it was received by IHS, when it was received. (Br-21 at p. 16). Mr. Bennett testified that he did not personally receive the letter and did not know whether IHS had ever received it. (Br-5 at pp. 113, 140). In any event, Mr. Bennett testified that it would not have been ordinary course for IHS to react to such a letter (assuming that IHS received it) by making an immediate payment to Georgia, unless Georgia threatened to terminate all of IHS' future reimbursements (which it did

not do).  (Br-5 at 140-141).  Mr. Bennett testified that even if IHS had received the letter on or

about August 28, 2003, as a matter of IHS' ordinary course of business IHS would have

attempted to negotiate payment terms with Georgia.  (*Id.* at p. 141).

**D.    The U.S. Global Settlement Agreement**

        The Trial record with respect to the U.S. Global Settlement Agreement and the

LLC's entitlement to keep all CMS payments pursuant to that agreement was equally one-sided,

and unrebutted. Mr. Nolan testified that he personally had explained to Mr. Feder that the

Medicare receivables recorded on IHS' books and records should not be included by Mr. Feder

as part of the Working Capital calculation, because Briarwood would not receive those

receivables as a result of the U.S. Global Settlement Agreement.  (Br-5 at pp. 174-78).

Consistent with Mr. Nolan's advice to him, Mr. Feder's work papers and the memoranda which

he sent to Briarwood's representatives reflected and noted that Briarwood would not receive

payments on Medicare-related receivables from CMS.  (Br-6 at pp. 109-13; Br-25, Ex. 7).

Therefore, Mr. Feder excluded IHS' Medicare-related receivables in all of his Working Capital

calculations.  (*Id.*).  Moreover, Mr. Forman admitted during his cross examination that he had

read the IHS disclosure statement discussion concerning the U.S. Global Settlement Agreement,

which indicated that IHS (and the LLC as its successor) would  receive payment on the Medicare

receivables from CMS as a setoff to the $19.1 million payment that IHS or the LLC would make

to the U.S. Department of Justice under the U.S. Global Settlement Agreement.  (Br-5 at pp. 96-

97, 174-78).  Mr. Forman also admitted that he sat through the evidentiary presentation with

respect to that subject during the confirmation hearing on IHS' plan of reorganization during the

spring of 2003.  (*Id.* at pp. 96-97).

Finally Mr. Nolan testified that he calculated IHS' Actual Working Capital as of the Closing Date, and that it exceeded $66 Million. (Br-5 at p. 199). Mr. Nolan reported this information to Mr. Feder, who reported it to Briarwood. (Br-5 at pp. 46-49; Br-6 at pp. 109, 139-46). Thus, after taking all of the payables and liabilities of which Briarwood complained and sought to transfer to the LLC, the Actual Working Capital received by Briarwood was over $4 Million more than the $62 Million Working Capital threshold.

**LEGAL ARGUMENT**

**I.  THE BANKRUPTCY COURT PROPERLY DENIED
EACH OF BRIARWOOD'S CLAIMS**

**A.      The Payroll Taxes Were Not Due Until After The Closing Date**

Under section 3.17 of the SPA, IHS simply represented and warranted that it would pay taxes which became due in the ordinary course of business up to the Closing Date. The Bankruptcy Court properly concluded that IHS continued to operate in the ordinary course of business with respect to the payment of taxes up to the Closing Date. (B-21 at pp. 10-11). All payroll and other taxes that became due thereafter were the exclusive payment responsibility of Briarwood. Based on the unrebutted evidence in the Trial record, the Bankruptcy Court found that the payroll taxes for which Briarwood seeks recovery did not become due until September 2, 2003, at the earliest, which was after the Closing Date. (*Id*.). The Bankruptcy Court also found that Briarwood was aware that unpaid payroll taxes not becoming due until after the Closing Date would be paid by Briarwood and would be part of the Working Capital Adjustment (which was waived pursuant to the SPA Closing Agreement).

**B.    The Payroll Tax Liabilities Were Neither "Deposits"
       Nor "Prepaid Items" Within the Meaning Of the SPA**

       The Bankruptcy Court correctly rejected Briarwood's argument that the payroll

tax liabilities at issue here were in the nature of "deposits" or "prepaid items," which went to

Briarwood. (Br-21 at pp. 13-14). Under the SPA, IHS' Cash as of the Closing Date was an asset

that was not transferred to Briarwood. The SPA provided, however, that "deposits" and "prepaid

items" were excluded from the general category of Cash remaining with IHS. *See* SPA Schedule

III (Br-1, Ex. 1) at S-16. Thus, it is patent that these terms refer to specific types of *assets* that

otherwise fall within the general category of Cash (which was kept by IHS and the LLC).

       The unrebutted testimony of the LLC's expert, Mr. Rosenfeld, was that unpaid

withholding taxes are not "prepaid items" or "deposits" under GAAP. (Br-7 at pp. 139-42; Br-21

at p. 14). Prepaid items arise when a person pays in advance for goods or services to be

provided. (*Id.*). Completely unlike prepaid items or deposits, IHS did not make an advance

deposit for payroll taxes or pre-pay them. (Br-7 at pp. 6-8; Br-21 at p. 14). Mr. Fulchino

testified that IHS never maintained separate bank accounts for payroll taxes, and that no funds

were actually withheld for withholding taxes or segregated by IHS. (Br-7 at pp. 6-8, 14-15; Br-

21 at p. 10). Further, Mr. Rosenfeld testified that, unlike prepaid items or deposits which are

assets, payroll taxes are liabilities. (Br-7 at p. 139; Br-21 at p. 14). In sum, there is no basis for

Briarwood's argument that the payroll tax liabilities which became due on or after September 2,

2003, constituted an asset which was to be transferred to Briarwood.

**C.    Briarwood's Additional Arguments Have No Merit**

       Briarwood also erroneously argues that IHS' failure to segregate the withholding

taxes and remit them prior to the Closing Date violated section 5.1 of the SPA, because IHS'

practice (i) did not comply with Legal Requirements and (ii) caused IHS to incur debts in excess of $250,000 in violation of subsections (g) and (k) of section 5.1.

There are no statutory provisions or regulations that require an employer to segregate funds to cover withholding taxes. The employer's obligation simply is to pay withholding taxes to the Federal, state or local tax authorities in a timely manner. Indeed, Mr. Rosenfeld testified that IHS' standard practice of not segregating cash to cover payroll taxes in advance of payment is typical for most companies, consistent with Mr. Rosenfeld's own experience, and in compliance with federal and state regulations. (Br-7 at pp. 125-27, 137-38).

Based on the unrebutted evidence before it, the Bankruptcy Court correctly ruled that IHS' ordinary course practices through the Closing Date regarding the payment of payroll taxes complied with all Legal Requirements. (Br-21 at pp. 10-13).

Briarwood's argument that IHS' failure to pay the payroll taxes due on or after September 2, 2003 caused it to be in violation of subsections (g) and (k) of section 5.1 of the SPA was not raised below, and should not be considered on appeal. *See, e.g., Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). In any event, that argument is meritless.

The general purpose and requirement of section 5.1 of the SPA was that IHS was to continue to operate its business in the ordinary course up to Closing. That obligation would, by necessity, require IHS to incur all ordinary course of business expenses in the ordinary operation of its business. Section 5.1 then continued in its subsections to limit IHS' right to incur debts in excess of $250,000, to the extent that such debts were outside the ordinary course of IHS' business.

> Section 5.1    Conduct of Business of the Seller and the Subsidiaries. During the
> period from the date hereof to the Closing Date, subject to the terms, conditions
> and transactions set forth in and contemplated under this Agreement and the Plan

of Reorganization, <u>the Seller shall, and shall cause each Subsidiary to conduct its</u>
<u>respective operations in the Ordinary Course of Business</u>, . . . . Further, during the
<u>period from the date hereof to the Closing Date except as . . . is otherwise</u>
<u>expressly permitted, contemplated or required by this Agreement</u>, applicable
Legal Requirements or the Plan of Reorganization . . . the Seller shall not . . .

> (g) incur or guarantee any Indebtedness in the aggregate amount of more than
> $250,000 or outside the Ordinary Course of Business, except for Indebtedness
> under the DIP Credit Agreement (as such term is defined in the Plan of
> Reorganization);

* * *

> (k) other than with respect to Taxes, incur or assume any liability or obligation
> (or series of related liabilities or obligations) in excess of $250,000 or outside
> the Ordinary Course of Business (other than the incurrence or accrual for
> PLGL and other than the Excluded Liabilities);

On its face, subsection (k) prohibited IHS from incurring liabilities in excess of

$250,000 **"other than with respect to Taxes."**  Thus that provision clearly is inapplicable to the

payroll taxes at issue here.  Moreover, the fact that subsection (k) expressly excepts taxes from

the limitation on IHS' right to incur liabilities in excess of $250,000, constitutes clear proof that

Briarwood understood and agreed that IHS would incur tax obligations above that amount.

Subsection (g) which limits IHS' right to incur **Indebtedness** is equally

inapplicable here.  The term **Indebtedness** is defined in Section 1.1 of the SPA as debt related to

borrowed funds.  Obviously, tax obligations do not represent debt related to borrowings.

In any event, Section 5.1 of the SPA required IHS to operate in the Ordinary

Course of Business[5] and in compliance with applicable Legal Requirements until the Closing

Date – which it did.  Section 5.1 also required IHS to use commercially reasonable best efforts to

---

[5]    Section 1.1 of the SPA defines "Ordinary Course of Business" as "the ordinary course of
business consistent with past custom and practice, including with respect to quantity and
frequency . . ." SPA (Br-1, Ex. 1) at § 1.1.

preserve substantially intact its business organization and preserve in all material respects its present business relationships and goodwill. That general charge set forth in the opening paragraph of section 5.1 took precedence over the limitations contained in both subsections (g) and (k). In fact, the language "except . . . as is otherwise expressly permitted, contemplated or required by this Agreement, applicable Legal Requirements," etc. – which modified both subsections (g) and (k), clearly was intended to limit the applicability of those subsections to the extent that they interfered with IHS' overarching obligation to conduct its business in the ordinary course.

## II. THE BANKRUPTCY COURT CORRECTLY RULED THAT THE LIABILITY TO GEORGIA MEDICAID WAS BRIARWOOD'S OBLIGATION

Briarwood claims that IHS' failure to pay the Medicaid Claim prior to Closing breached section 5.16 of the SPA. *See* Br. Mem. at pp. 12-14. However, that section as modified by the July 21 Stipulation simply provided that: "The Seller agrees to pay any Medicaid recoupments prior to Closing in the Ordinary Course of Business." The unrebutted Trial record summarized above established that it was not in IHS' Ordinary Course of Business to have repaid the liabilities to Georgia Medicaid prior to the Closing Date. Therefore, the Bankruptcy Court properly concluded that under the express language of section 5.16 of the SPA, as modified, IHS was not responsible for the Medicaid Claim. Rather this claim was a liability assumed by Briarwood under the SPA. (Br-21 at pp. 18-19).[6]

---

[6]    Briarwood's mischaracterization of Mr. Johnsen's testimony (*i.e.*, that he admitted that the Medicaid Claim would constitute Medicaid recoupments) does not help its cause. *See* Br. Mem. at pp. 12-13. As the Bankruptcy Court correctly noted, Mr. Johnsen in fact testified that "[i]t (*i.e.*, Georgia Medicaid's Claim) would be a recoupment when the State of Georgia recouped it." (Br-21 at p. 18 n.10). That testimony does not in any way support Briarwood's contention that it was in IHS' ordinary course of business to have repaid Georgia Medicaid

(continued...)

A.    **The Liabilities To Georgia Medicaid Were**
      **Neither Prepaid Items Nor Deposits**

True to form, Briarwood confusingly argues that the <u>liability</u> to Georgia Medicaid

was either a prospective payment (*i.e.,* "prepaid item") "in advance of services rendered" or an

"excess payment" (*i.e.,* "deposit "), and therefore an <u>asset</u> transferred to Briarwood under the

terms of the SPA. *See* Br. Mem. at pp. 14-15. Briarwood attempts to buttress its argument by

noting that IHS made a notation "prospective medicaid payment" in its records with respect to

the liability to Georgia Medicaid. Briarwood argues that the notation is an admission by IHS that

such overpayments constitute payments in "advance of services rendered."

Briarwood's tortured argument that IHS' <u>liability</u> to Georgia Medicaid somehow

actually is an IHS asset, within the meaning of "prepaid items" or "deposits," is erroneous on its

face, and also is inconsistent with the SPA and with GAAP.

Mr. Rosenfeld testified, based upon the application of GAAP and his review of

the SPA, that IHS' obligations relating to the Medicaid Claim did not constitute deposits or

prepaid items. (Br-9 at pp. 138-140). Mr. Rosenfeld testified that under GAAP,

(i) deposits are generally amounts paid by a person for purposes of security (*id.* at pp. 131-132),

and (ii) a prepaid item is "when a company takes its cash and pays in advance for goods or

services that will be used or consumed during the next year, but during the current operating

cycle." (*Id.* at p. 132). Mr. Rosenfeld also testified that "overpayments by Medicaid authorities

---

6         (...continued)
          prior to the Closing Date.

Doc. #IHS - Brief                           24

are characterized as current liabilities on the books of the nursing homes receiving those payments, rather than assets, because they are owed by the nursing home to the State." (*Id.* at pp. 139-42; Br-21 at 19-20).

Thus, the Bankruptcy Court properly held that the amount owed to Georgia Medicaid was not a "prepaid item" or "deposit", but instead was a liability transferred to Briarwood under the SPA.

> Simply calling something a 'prospective payment', however, does not make it a pre-paid item or deposit. The fallacy of Briarwood's argument is that the Georgia over-payments are not assets at all; they are liabilities. The evidence established that there was not a bank account into which the Debtors deposited the Georgia overpayments. (8/10/05 TR. at 65). Instead, those funds were swept into the Debtors' concentration account and used to pay their secured lenders (*Id.*). At the time of Closing, therefore, there was no asset but only a liability for payment.

(Br-21 at p. 19).

Briarwood also wrongly (and inconsistently) argues that the liability to Georgia Medicaid was nevertheless an Excluded Liability, because it fell within the category of "Liabilities relating to Excluded Assets," on the theory that it related to Cash. However, as already noted, the evidence at Trial was that IHS did not have a separate account that contained the proceeds of Georgia Medicaid's payments to IHS. In fact, Mr. Bennett testified that it was IHS' standard practice to commingle all Medicaid receipts with all other funds in IHS' general concentration account. (Br-5 at pp. 137-38; Br-21 at p. 15). Similarly, Messrs. Johnsen and Fulchino both testified that under IHS' credit facility virtually all of IHS' cash was swept on a daily basis through a "lockbox" account, and applied to pay down IHS' revolving credit balance. (Br-7 at pp. 14-15; 57-58; Br-21 at p. 15). There is simply no evidence in the record to support the notion that there was any Cash at Closing "relating" to the Medicaid Claim.

At Trial and in its post-Trial brief filed with the Bankruptcy Court, Briarwood

made this same "related to cash" argument with respect to the Payroll Tax Claim. The

Bankruptcy Court properly rejected that argument in language and reasoning equally applicable

to the Medicaid Claim.

> If Briarwood's argument were accepted, any number of liabilities could be "related" to
> the Debtors' cash, thereby excusing Briarwood from its agreement to assume and pay
> them. In the extreme, Briarwood could argue that any account for which the Debtors
> promised payment is an Excluded Liability because it is related to the Excluded Asset,
> Cash. The Court cannot accept such an expansive reading of the SPA and, therefore,
> rejects Briarwood's argument.

(Br-21 at p. 13).

The Bankruptcy Court also noted the fallacy of Briarwood's argument that IHS

was contractually obligated to leave Cash behind to satisfy the liability to Georgia Medicaid,

considering that prior to the July 21 Stipulation section 5.16 expressly provided for the payment

of such liabilities out of the Medicaid Escrow funded out of the Original Purchase Price. (Br-21

at pp. 18-19). That escrow provision (which was removed in consideration for a $15.5 million

reduction in the Original Purchase Price) would have been meaningless if IHS was already

required to leave Cash behind to repay Medicaid overpayment liabilities. Thus, the Bankruptcy

Court correctly held that the elimination of the Medicaid Escrow pursuant to the July 21

Stipulation eliminated any right that Briarwood had to be repaid on post-Closing recoupments.

(Br-2, Ex. C, at ¶29; Br-21 at pp. 17-18).

Finally, Briarwood, citing to *Visiting Nurse Ass'n of Western Pennsylvania*, 101

B.R. 462 (Bankr. W.D. Pa. 1989), also argues that the Georgia Medicaid claim represents

"excess payments" which unjustly enriched IHS, and therefore should have been held in trust for

the State. Briarwood then argues that since IHS should have held those payments in trust for the

State, they constituted a "deposit" which was an exclusion to "Cash" under the SPA, which

belonged to Briarwood. *See* Br. Memo at p. 15. Briarwood's convoluted syllogism is simply

wrong. There was no legal requirement for IHS to hold the payments from Georgia Medicaid in

trust for the State and IHS did not do so. The Bankruptcy Court correctly concluded that,

because IHS did not segregate the Georgia Medicaid funds from its general operating account

(which was swept daily by IHS' lender), there was no Cash to impress with a trust for the benefit

of Georgia, and there was no deposit in existence for Briarwood to claim as its own. (Br-21 at

pp. 20-21).

**B.    The Bankruptcy Court Correctly Held That Briarwood
        Has Already Conceded Its Liability To Georgia Medicaid**

                In addition to all of the foregoing, the Bankruptcy Court correctly ruled that the

very issue raised by Briarwood in the Medicaid Claim was the subject of a prior contested matter

and Court hearing (the "<u>Foster Hearing</u>") where Briarwood conceded that Briarwood, and not the

LLC, was responsible to repay Georgia Medicaid. At that hearing, Briarwood's counsel

memorialized Briarwood's agreement that it was obligated to repay Georgia Medicaid as follows:

> Your Honor, we are prepared to make the payments that have to be
> made to the State. If they are taking ten percent a week we will
> make those payments. If the policy changes we will make that
> payment as well. And based upon that if Triad wants to close
> we're prepared to do that. But I don't think that we should be
> required to make payments to the State beyond what everybody
> else is making, and that's what- that's basically our position.
> We're prepared to meet that obligation.

(Br-2, Ex. F, at pp. 95-96).

                Having presided over the Foster Hearing and having observed and accepted

Briarwood's concession as the basis for resolving the contested matter at that hearing, Judge

Walrath ruled that Briarwood cannot relitigate the issue of Briarwood's obligation to Georgia

Medicaid.

Doc. #IHS - Brief                                27

> The Court rejects Briarwood's contention. At the [Foster] hearing, the issue
> presented was whether the estate or Briarwood was responsible for the repayment
> of the Georgia over-payments. (Id. at 91.) In response, Briarwood conceded its
> obligation to make the payments. (Id. at 92-96.) It did not preserve any right to
> pursue the estate for payments it agreed to make at that hearing. (Id.)

(Br-21 at pp. 21-22).

Briarwood tries to renege on its binding prior concession by arguing that, under

New York law, its prior admission that it was obligated to pay Georgia Medicaid did not "waive"

its right to recover that money from the LLC, because Briarwood's "waiver" was not knowingly

and intentionally made, nor was it made pursuant to a writing as required pursuant to section

11.12 of the SPA. This argument is baseless. While the heading on this point in the Bankruptcy

Court Decision is titled "Waiver", the Bankruptcy Court actually determined that Briarwood had

affirmatively conceded on the record its obligation to pay all amounts due to Georgia Medicaid.

The law in New York[7] is clear that an attorney's concession in open court binds his client as a

judicial admission. *See Diaz v. Rerio*, 2000 WL 502852 (S.D.N.Y. 2000), *accord Lowy v. Bay*

*Terrace*, 869 F.2d 173 (2d Cir. 1989). Also, an agreement in open Court is enforceable even if it

modifies the terms of a written agreement that expressly precludes oral modifications. *See*

*Meinwald v. Meinwald*, 56 A.D. 2d 565 (N.Y. App. Div. 1977).

---

[7]    Section 11.3(a) of the SPA expressly provides that the agreement was governed by New
York law.
> (a) Except to the extent governed by the Bankruptcy Code, the interpretation and
> construction of this Agreement, and all matters relating hereto, shall be governed by
> the laws of the State of New York applicable to contracts made and to be performed
> entirely within the State of New York, without giving effect to any conflicts of law
> provisions thereof.

### III. THE BANKRUPTCY COURT WAS CORRECT IN DETERMINING THAT THE SECOND CMS PAYMENT BELONGED TO THE LLC, NOT BRIARWOOD, PURSUANT TO THE TERMS OF THE U.S. GLOBAL SETTLEMENT AGREEMENT

As the Bankruptcy Court correctly noted, section 6.17 of the SPA (which is placed among the conditions to Briarwood's obligation to close on the SPA) contemplated that <u>all</u> claims between IHS and the various United States Government Agencies (including CMS) would be resolved by the U.S. Global Settlement Agreement.  (Br-21 at pp. 24-25).  Section 6.7 provides in applicable part:

> 6.17 <u>Medicare Settlement</u>.  A comprehensive settlement agreement with the Department of Justice, CMS, OIG and/or any other applicable federal agency or agencies regarding the asserted claims against Seller and the Subsidiaries shall have been executed, providing for a full settlement and compromise of all such asserted claims against Seller and the Subsidiaries arising under governmental health care programs, other than those claims set forth on **Schedule 6.17** (the "***Medicare Settlement***"). Seller shall take reasonable steps to negotiate an agreement under which such asserted claims (i) are the sole and exclusive obligation of, and will be paid and satisfied solely and exclusively by, the Seller, (ii) will not be assumed by or become in any manner whatsoever an obligation of the Purchaser or its Subsidiaries, and (iii) do not become the liability of the Purchaser and its Subsidiaries.

SPA (Br-1, Ex. 1) at § 6.17.

Thus, under section 6.17, IHS (and the LLC) was to obtain an overall settlement with the United States – both with the Department of Justice regarding False Claims, and with CMS, the entity that owed the funds to IHS for underpayments, but was withholding payment as a result of certain counterclaims and/or rights of setoff asserted by CMS.  (Br-21 at p. 25).  The U.S. Global Settlement Agreement itself provided that the matters being settled under that agreement were the False Claims and IHS' claims against CMS for underpayments allegedly owed for cost reports prior to May 21, 2002.  (*Id.*; Br-2, Ex. G).  The $17.1 Million CMS Payment and the $19.1 False Claims Act Payment were components of that global settlement.

The Bankruptcy Court presided over the hearings on the SPA, the U.S. Global Settlement Agreement, the Disclosure Statement, and the Plan Confirmation – all of which dealt with, at least in part, the U.S. Global Settlement Agreement and the issues of payments to be made between IHS (or the LLC) and the United States. Briarwood also was a participant at each of those hearings.

The Bankruptcy Court specifically found that as part of the U.S. Global Settlement Agreement, IHS and CMS agreed that CMS could hold any additional payments due to IHS in administrative freeze until certain appeals were concluded. (Br-21 at pp. 23 n.11, 25-26). The parties also agreed that the funds subject to the administrative freeze would be used to pay certain post-petition CMS claims until the underlying long-term care facilities were transferred by IHS to Briarwood or some other third party. (*Id.* at p. 26). The parties further agreed that if there were insufficient frozen funds to pay those claims, IHS would pay the difference; and, if there were any funds left after that offset (such as the Second CMS Payment) those funds would be remitted to IHS (or the LLC). (*Id.*). The only requirement under the U.S. Global Settlement Agreement and the SPA was that IHS would attempt to negotiate an agreement under which Briarwood would not have to go out of pocket to pay any claims owed to CMS by IHS. In fact IHS successfully negotiated such an agreement. (Br-2, Ex G; Br-21 at p. 26). Accordingly, the Bankruptcy Court properly denied the Second U.S. Global Settlement Claim.

Based on all of the foregoing, the Bankruptcy Court correctly ruled that the sums set off and paid by CMS to IHS and/or the LLC under the U.S. Global Settlement Agreement were excluded from the assets sold to Briarwood and are not due Briarwood under the terms of the SPA. (Br-21 at p. 29).

**A.    The Bankruptcy Court Afforded Briarwood Ample Opportunity
To Address The Merits Of The Second U.S. Global Settlement Claim**

Briarwood baselessly contends that it was unduly prejudiced and denied due

process by the Bankruptcy Court's denial of the Second U.S. Global Settlement Claim, because

the LLC purportedly failed to raise any defenses to this claim.  To the contrary, it is clear from

the record that the LLC stated both in writing and during oral argument that the parties'

competing positions respecting Briarwood's Second U.S. Global Settlement Claim should be

determined by the Bankruptcy Court together with Briarwood's original U.S. Global Settlement

Claim, because the same underlying facts and legal arguments related to both.

Specifically, in its written opposition to the Second U.S. Global Settlement Claim

(*see* Br-16 at p. 5), the LLC stated, "given the likelihood that the Court will render a decision in

connection with the [Motion to Compel] that will determine the issues raised by this Motion, the

LLC submits that the Motion should be adjourned without date . . ."  Likewise at the hearing on

Briarwood's Second U.S. Settlement Claim (Br-19 at p. 32), the LLC's counsel stated:

> So we think, Your Honor, that all of the issues as [they] relate[] to the [U.S.
> Global Settlement Agreement] that were put before the Court back in July and
> August [*i.e.*, the Trial] are relevant to the determination here. . . . [I]f the Court
> rules that [the LLC] is entitled to keep the [First CMS Payment], we may very –
> the Court may very well within the same ruling determine that [the LLC] is
> entitled to keep [the Second CMS Payment].

Moreover, at the conclusion of that hearing the Bankruptcy Court specifically

authorized Briarwood (and the LLC), to file an additional brief if it wished:

> [T]o the extent the parties feel that any additional facts specific to
> this are necessary, they can either submit a stipulation of facts to
> the effect or we'll have an evidentiary hearing.  And to the extent
> the parties want to brief the issue – I think it's covered by the other
> [matters *sub judice*], but to the extent the parties think additional
> briefing is necessary, they should submit that also.

31

(Br-19 at pp. 38-39).

Briarwood, however, failed to do so. Briarwood was given every available opportunity to raise any arguments it wished regarding the Second CMS Payment and/or to rebut the LLC's contentions. Thus, there is no basis for Briarwood to claim that it was unduly prejudiced and denied due process by the Bankruptcy Court.

## STATEMENT OF ISSUE PRESENTED ON CROSS-APPEAL

Whether the Bankruptcy Court erred in denying the LLC's counterclaim for attorneys' fees on the basis that there was no "prevailing party" under section 11.11 of the SPA, even though the LLC defeated all of the Briarwood Claims.

## ARGUMENT IN SUPPORT OF LLC'S CROSS-APPEAL

Pursuant to section 11.11 of the SPA, the LLC is entitled to recover the substantial legal fees which it incurred in successfully defending itself, against all of the Briarwood Claims. That section plainly states:

> 11.11 Attorneys' Fees and Costs. Should either party institute any arbitration, action, suit or other proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to receive from the losing party reasonable attorneys' fees and costs incurred in connection therewith.

*See* SPA (Br-1, Ex. 1) at § 11.11.

Notwithstanding this provision and the denial of all of the Briarwood Claims, the Bankruptcy Court denied the LLC's request for its attorneys' fees and costs in litigating this dispute in the following two sentences:

> Although the LLC has prevailed on all claims brought by Briarwood in this contested matter, it has not prevailed on all its counterclaims. Therefore, the Court concludes that there is no "prevailing party" and that an award of attorneys' fees and costs is not warranted.

(Br-21 at p. 41).

Other than the Attorneys' Fees Counterclaim, the LLC proceeded with three counterclaims at Trial, two of which were <u>contingent</u> upon Briarwood succeeding on its claims. Those two counterclaims were rendered moot as a result of the Bankruptcy Court's denial of Briarwood's claims. The LLC's only other counterclaim, the Third Party Counterclaim, was resolved favorably for the LLC. In essence, that counterclaim was a request for a determination that Briarwood, and not the LLC, was responsible for a $25,000 claim asserted by a third party. The LLC did not attempt to prove the amount or underlying validity of that third party claim, but simply introduced evidence sufficient to establish that the claim existed, and that Briarwood had refused to address the claim, and instead advised the creditor that the LLC was responsible. The Bankruptcy Court <u>agreed</u> with the LLC that the claim was not an Excluded Liability, and therefore, the LLC was <u>not</u> responsible for it. (Br-21 at pp. 39-41). However, the Bankruptcy Court stopped short of finding that Briarwood was responsible, not because the LLC could be liable, but because the claim related to IHS' former subsidiary, Rotech, and the LLC had not established that the claim was a valid claim for which Briarwood (as opposed to Rotech) was responsible. (*Id.*).

From the LLC's perspective, the Bankruptcy Court's decision regarding the Third Party Claim was a victory for the LLC. If the third party creditor asserts an administrative expense claim against Briarwood, Briarwood cannot assert that the claim is an Excluded Liability for which the LLC is responsible.

Moreover, and in any event, the Bankruptcy Court erred as a matter of law in holding that, although the LLC defeated all of the claims brought by Briarwood, the LLC was not

the "prevailing party" for purposes of awarding attorneys' fees and costs in this matter because the LLC did not win all of its Counterclaims.

The standard rule governing the "prevailing party" standard is the same in the contractual fee-shifting setting as in the statutory fee-shifting setting. *See, e.g., MTX Comm. Corp. v. LDDS/Worldcom, Inc.*, 2001 U.S. Dist. LEXIS 7912, at *2 (S.D.N.Y.); *Kuk Je Medical Corp. v. Home Diagnostics, Inc.*, 1994 WL 465844, at *3 (S.D.N.Y.). In addressing a fee-shifting statute, the Supreme Court has determined that the prevailing party is "a party in whose favor a judgment is rendered, regardless of the amount of damages received." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health and Human Resources*, 532 U.S. 598, 603 (2001). In addition, in order to be considered a "prevailing party", a litigant is only required to prevail on some claims, not all of them. *See LaRouche v. Kezer*, 20 F.3d 68, 71 (2d Cir. 1994) ("A party need not succeed on every issue raised by him, nor even the most crucial ones. Victory on a significant claim will suffice to give him prevailing party status."); *see also Abrahamson v. Bd. of Educ. of the Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 79 (2d Cir. 2004) (same).

Indeed, both the Second and Third Circuits have specifically held that an award of attorneys' fees and costs is warranted even when a defendant fails to sustain a minor counterclaim, if it successfully defends itself against the plaintiff's substantial claims. *See Tyler v. O'Neil*, 2004 U.S. App. LEXIS 21308, at *10-11 (3d. Cir.); *Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 28 (2d Cir. 1974); *Brenner v. World Boxing Counsel*, 675 F.2d 445, 456 (2d Cir. 1982); *see also Great Earth Int'l Franchising Corp. v. Milks Dev.*, 2004 U.S. Dist. LEXIS 18366 (S.D.N.Y.) (allowing recovery under a contractual fee shifting provision to a defendant who had prevailed on some, though not all, of its counterclaims against the plaintiff where the plaintiff had prevailed on

none of its own claims); *25 East 83 Corp. v. 83rd Street Assocs.*, 213 A.D.2d 269 (N.Y. App. Div. 1995) (determining that the defendant was the prevailing party for successfully defending against plaintiff's lawsuit); *Maine School Admin. Dist. No. 35 v. Mr. and Mrs. R.*, 321 F.3d 9, 14  (1st Cir. 2003) (same); *Terrydale Liquidating Trust v. Herbert Barness*, 645 F. Supp. 920 (S.D.N.Y. 1986) (same).  Accordingly, even assuming *arguendo* that the Bankruptcy Court was correct in concluding that the LLC did not prevail on its Third Party Reimbursement Counterclaim (which was inconsequential in the context of this litigation), because the LLC successfully defended against and defeated <u>all</u> of the Briarwood Claims, the LLC was the prevailing party within the meaning of the SPA and binding precedent. *See, e.g., Tyler v. O'Neil*, 2004 U.S. App. LEXIS 21308, at \*10-11; *Scientific Holding Co. v. Plessey*, 510 F.2d at 28; *Brenner v. World Boxing Counsel*, 675 F.2d at 456.

Thus, the Bankruptcy Court erred in denying the Attorneys' Fees Counterlaim, and that ruling should be reversed and the matter remanded to the Bankruptcy Court for a determination of the proper fee award to the LLC.  At a minimum, the Bankruptcy Court should have awarded the LLC costs for defending against the Briarwood Claims, which represented the vast majority of the expense incurred in connection with the Trial.

## CONCLUSION

The Trial record fully supports those portions of the Bankruptcy Court Decision denying each of the Briarwood Claims. However, the Bankruptcy Court's denial of the LLC's Attorneys' Fees' Counterclaim constituted reversible error. Accordingly, this Court should (a) affirm that portion of the Bankruptcy Court Decision that denied the Briarwood Claims, and (b) reverse the ruling in the Bankruptcy Court Decision denying the Attorneys' Fees Counterclaim, and remand that issue to the Bankruptcy Court for its determination as to the proper attorneys' fee award to the LLC.

Dated: Wilmington, Delaware
      May 3, 2007

                YOUNG CONAWAY STARGATT & TAYLOR, LLP

                Robert S. Brady (No. 2847)
                Edmon L. Morton (No. 3856)
                Joseph M. Barry (No. 4221)
                The Brandywine Building
                1000 West Street - 17th Floor
                P.O. Box 391
                Wilmington, DE  19899-0391
                (302) 571-6600
                        - and -

                KAYE SCHOLER LLP
                Arthur Steinberg
                Lester M. Kirshenbaum
                425 Park Avenue
                New York, NY  10022-3598
                (212) 836-8000

                *Co-counsel for IHS LLC*

## CERTIFICATE OF SERVICE

I, Joseph M. Barry, Esquire, hereby certify that I am not less than 18 years of age and that on May 3, 2007, I caused a copy of the attached document to be served on the following parties by Federal Express or Hand Delivery, as indicated:

**By Federal Express**
Abraham J. Backenroth, Esq.
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue, 28th Floor
New York, NY 10017

**By Hand Delivery**
Frederick B. Rosner, Esq.
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801

Co-Counsel for Abe Briarwood Corporation

Joseph M. Barry (Delaware Bar No. 4221)